# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JASON ARRON ARREDONDO,
Defendant and Appellant.

S244166

Fourth Appellate District, Division Two
E064206

Riverside County Superior Court
RIF1310007 and RIF1403693

---

December 16, 2019

Justice Chin authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

---

PEOPLE v. ARREDONDO

S244166


Opinion of the Court by Chin, J.


A jury convicted defendant Jason Arredondo of multiple sex offenses involving several minor victims. While three of the victims testified, the trial court positioned a computer monitor so they could not see defendant and he could not see them. We granted review in this case to determine whether the trial court's action violated defendant's right of confrontation under the Sixth Amendment to the United States Constitution. We conclude that, as to one of the witnesses, the trial court committed reversible error, and we reverse defendant's convictions involving that witness. Regarding the other two witnesses, we conclude that defendant forfeited his claim by failing to object to the trial court's action, and that defendant has not shown his attorney's failure to object constituted ineffective of assistance of counsel.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As here relevant, defendant was charged by information with committing the following sexual offenses involving F.R., Ar.R, An.R, and M.C.: eleven counts of lewd acts upon a child under the age of 14 (Pen. Code, § 288, subd. (a))[1]; one count of lewd acts upon a child under the age of 16 (§ 288, subd. (c)(1)); one count of oral copulation of a person under the age of 14

_____

[1]     All further unlabeled statutory references are to the Penal Code.

1

(§ 288a, subd. (c)(l)); and one count of sexual penetration of a person under the age of 14 (§ 289, subd. (j)). The information also alleged numerous enhancements. All four victims testified at trial. At that time, F.R. was 18 years of age, M.C. was 16, Ar.R was 14, and An.R was 13.

When F.R. first entered the courtroom to take the witness stand, the bailiff said, "Right this way, Miss," and the court added, "[I]f you'd just step up here, please, and follow the instructions of my deputy there. He will tell you what you need to do." The bailiff then stated, "Please watch your step as you take the stand. Stay standing, raise your right hand, and the clerk will swear you in." F.R. started crying, and the court asked, "[D]o you need a moment?" F.R. replied, "I think so." The court then announced, "We will take a short break. Take about five or ten minutes, folks, and we will attempt to start again at that time. . . . We will be in a short recess." A minute order indicates that the court took a recess "to allow for witness composure."

After the jury left the courtroom, the court said to the prosecutor, "[A]fter your victim-witness advocate has spent some time with her, just let me know if she is able to proceed or ready to proceed and we will resume." The prosecutor responded, "I am going to inquire of her if she prefers the advocate sits behind her." The court replied, "Oh, yes. Right. If there's something like that that you can do that would make her more comfortable, I'm fine with that. I mean, the law allows it."

When proceedings resumed about 30 minutes later, but before the jury reentered the courtroom, the court stated, "We've made some modifications to the witness box to accommodate the witness." After the jurors took their seats, F.R. entered the

courtroom and the bailiff said, "Right this way. Watch your step as you take the stand. Please remain standing and raise your right hand, and the clerk will swear you in." F.R. took the oath standing at the witness box and then sat down to testify, with her advocate sitting nearby. After she testified that she knew someone named Jason Arredondo, and that he was her mother's boyfriend, the prosecution asked, "Do you see Jason in court today?" F.R. replied, "[Y]es." The prosecution then asked, "Can you identify an item of clothing he is wearing and where, to your left, to your right, is he seated?" F.R. answered, "To my right with the blue shirt." The prosecution asked "[i]f the record could reflect the witness has identified the defendant," and the court responded, "It may."

About 45 minutes later, the court took another recess. After the jurors left the courtroom, it said: "I just want to note for the record too that I had mentioned earlier that the witness box had been reconfigured a little bit. It's not a big change, but the monitor was placed kind of to the witness's right, apparently blocking at least some of her view of possibly [defendant]. And I think that was the only change that's been made." Addressing defendant's counsel, the court then asked, "Did you have anything you wanted to say about that?" Defendant's counsel responded, "Yes I did, Your Honor. It does block [defendant's] entire view of the witness." The court replied, "Well, he is present in court. He can hear the witness, hear her answers. I think [the accommodation is] appropriate given her initial reaction. [¶] Again, for the record when she first came in to take the oath, she was unable to proceed at that time. We took about a 15–minute break before she could get her emotions back in order." Defendant's counsel responded, "[F]or the record, I object to my client being unable to view the witness as the

witness testifies in that his knowledge of the witness would be able to assist counsel in her demeanor and looks, you know, as the quasi parent. He is aware of how the witness looks when the witness is maybe not telling the truth or when the witness is feigning something. I don't have that knowledge. I have never seen this witness before. And [defendant] is unable to assist me in that regard because he is unable to see the witness."

The court, commenting that it wanted to make "the record[] clear," then stated: "It's a fairly small computer monitor that's on the witness stand. It's there for the witness to be able to view photographs that are shown on the monitor. Again, it was simply repositioned so that the witness doesn't have to look at [defendant]. I think — at best it's a small infringement on his confrontation rights. I think it's an allowable infringement on his right to confrontation, but it's a very limited blockage, if you will." The prosecution, stating that it wanted "to clarify" the record, then added: "The position of the monitor in terms of where it is in the witness box is the exact same as it was for [M.C.]. It was elevated with a Penal Code as well as one volume of the CALCRIMs." The court thanked the prosecution "for noting that" and commented, "I didn't see that." The prosecution continued, "Given that the witness had indicated that the defendant looked at her the first time she came in." The court added, "And whether that happened or didn't, I think it's appropriate."

Defendant's counsel responded, "[F]or the record, Your Honor, when the witness first came in, she began crying before she was even able to see [defendant's] face. So [defendant] made no effort to look at her, intimidate her, or make any kind of eye contact or suggestive contact with her." The court replied: "I understand. I'm not casting any aspersions at this point. But it

clearly affected her, and I think it's appropriate for the court to take whatever small efforts it can make to make the witness more comfortable without infringing on any of [defendant's] constitutional rights, and I don't believe that his rights have been infringed on at this point." The court then "note[d]" counsel's objection "for the record" and "overruled" it.

Later, after both sides had rested but before closing arguments, the prosecution noted on the record that the monitor had been similarly repositioned during the testimony of Ar.R and An.R. Defendant's counsel did not object to the repositioning with respect to Ar.R and An.R. The fourth victim, M.C., had testified without the repositioned monitor.

The jury convicted defendant of the 14 charged crimes and found the enhancement allegations to be true. The court sentenced him to an indeterminate prison term of 275 years to life, plus a determinate term of 33 years to run consecutively.

The Court of Appeal affirmed defendant's convictions but, based on the parties' agreement, remanded for resentencing on three counts. Regarding defendant's claim that repositioning of the monitor violated his constitutional right of confrontation, the court unanimously held as to Ar.R and An.R that defendant had (1) forfeited the claim by failing at trial to object to the modification's use for these witnesses, and (2) not shown that his counsel's failure to object constituted ineffective assistance. As to F.R., the court was divided. The majority found no error, concluding that the trial court's action was consistent with governing precedent. The dissent disagreed, finding that the trial court's decision was inconsistent with established Sixth Amendment law.

We granted defendant's petition for review, specifying the following issue for consideration: "Was defendant's right of confrontation violated when he was unable to see witnesses as they testified because the trial court allowed a computer monitor on the witness stand to be raised by several inches to allow them to testify without seeing him when they testified in his presence?"

## II. DISCUSSION

To address defendant's claim, we begin by reviewing the two decisions of the United States Supreme Court that provide principal guidance on the issue — *Maryland v. Craig* (1990) 497 U.S. 836 (*Craig*), and *Coy v. Iowa* (1988) 487 U.S. 1012 (*Coy*) — and the only case in which we have applied those decisions in an analogous context — *People v. Gonzales* (2012) 54 Cal.4th 1234 (*Gonzales*). We then apply these precedents to the record before us.

### A. Relevant Precedent

In *Coy*, *supra*, 487 U.S. at pages 1012, 1014, the high court considered whether the trial court had violated the defendant's right of confrontation by placing, as authorized by state statute, a large screen between him and the witness stand while two complaining witnesses testified that he had sexually assaulted them. The court began with a general discussion of the constitutional right's nature, explaining that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." (*Id.* at p. 1016.) This "guarantee," the court stated, "serves ends related both to appearances and to reality." (*Id.* at p. 1017.) Because "something deep in human nature . . . regards face-to-face confrontation between accused and accuser as 'essential to a fair

trial in a criminal prosecution'" (*ibid.*), "the right of confrontation 'contributes to the establishment of a system of criminal justice in which the perception . . . of fairness prevails'" (*id.* at pp. 1018-1019). And "[t]he perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. A witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. . . .' [Citation.] It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' In the former context, even if the lie is told, it will often be told less convincingly." (*Id.* at p. 1019.) In this sense, "the right to face-to-face confrontation," like the right to cross-examine the accuser, "serves" to "'ensur[e] the integrity of the factfinding process.'" (*Id.* at pp. 1019-1020.) It is true that this "face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs." (*Id.* at p. 1020.)

Applying these principles, the *Coy* court held that use of the screen at trial had violated the defendant's constitutional right. With the screen in place and the courtroom lighting adjusted, the defendant could "dimly . . . perceive the witnesses" while they testified, but they could not see him "at all." (*Coy, supra,* 487 U.S. at p. 1015.) "It is difficult," the court said, "to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." (*Id.* at p. 1020.) The court rejected the government's argument that the defendant's "confrontation interest . . . was outweighed by the necessity of protecting victims of sexual abuse." (*Ibid.*) If there are "any

exceptions" to the confrontation clause's "irreducible literal meaning" — i.e., the " 'right to *meet face to face* all those who appear and give evidence *at trial*' " — "they would surely be allowed only when necessary to further an important public policy." (*Id.* at p. 1021.) "Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." (*Ibid.*)

Two years later, in *Craig*, the high court took up the issue again in a case where an alleged child abuse victim had testified at trial in a room separate from the courtroom, in the physical presence of only the prosecutor and defense counsel, while the defendant, the judge, and the jury remained in the courtroom and watched the testimony by one-way closed-circuit television. (*Craig*, *supra*, 497 U.S. at p. 840.) The court began by explaining that the confrontation clause does not "guarantee[] criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." (*Id.* at p. 844.) "Although face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' [citation] . . . it is not the *sine qua non* of the confrontation right" and is not required "in *every* instance in which testimony is admitted against a defendant." (*Id.* at p. 847.) "[I]n certain narrow circumstances, 'competing interests, if "closely examined," may warrant dispensing with confrontation at trial.' " (*Id.* at p. 848.) In other words, " 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' [citation], a preference that 'must occasionally give way to considerations of public policy and the necessities of the case.' " (*Id.* at p. 849.) However, the *Craig* court cautioned, "[t]hat the face-to-face confrontation requirement is not absolute does not . . . mean that it may easily

be dispensed with." (*Id.* at p. 850.) On the contrary, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." (*Ibid.*)

Turning first to the latter requirement, the high court in *Craig* found that the Maryland procedure provided sufficient "assurances of reliability" because it "preserve[d] all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." (*Craig, supra*, 497 U.S. at p. 851.) Notwithstanding "the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation — oath, cross-examination, and observation of the witness' demeanor — adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." (*Ibid.*) Thus, Maryland's "use of the one-way closed circuit television procedure . . . does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." (*Id.* at p. 852.)

The *Craig* court next considered whether "use of the procedure [was] necessary to further an important state interest." (*Craig, supra*, 497 U.S. at p. 852.) The court first recognized the " 'compelling' " (*ibid.*) nature of the state's interest in protecting " 'minor victims of sex crimes from further

trauma and embarrassment' " (*ibid.*), and concluded that, upon "an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant" (*id.* at p. 855). "To be sure," the court explained, "face-to-face confrontation may be said to cause trauma for the very purpose of eliciting truth." (*Id.* at p. 856.) However, "where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that such confrontation would in fact *disserve* the Confrontation Clause's truth-seeking goal." (*Id.* at p. 857.) Thus, "where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." (*Ibid.*)

Regarding the requirement that denial of face-to-face confrontation be "necessary to further" the state's interest (*Craig, supra,* 497 U.S. at p. 852), the *Craig* court stressed that "[t]he requisite finding of necessity must . . . be a case-specific one: The trial court must hear evidence and determine whether use of the [alternative procedure] is necessary to protect the welfare of the particular child witness who seeks to testify. [Citations.] The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. [Citations.] Denial of face-to-face

confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than 'mere nervousness or excitement or some reluctance to testify.' " (*Id.* at pp. 855-856.) The *Craig* court declined to specify "the minimum showing of emotional trauma required for use of the special procedure," reasoning that the Maryland statute "clearly suffice[d] to meet constitutional standards" because it "require[d] a determination that the child witness will suffer 'serious emotional distress such that the child cannot reasonably communicate.' " (*Id.* at p. 856.)

Finally, the *Craig* court applied these principles to the record before it, which showed the following: The state moved to invoke the statutory closed-circuit television procedure and presented "expert testimony that the named victim" and several "other children who were alleged to have been sexually abused by" the defendant " 'would have some or considerable difficulty in testifying in [the defendant's] presence' " and "would suffer 'serious emotional distress such that [they could not] reasonably communicate,' [citation], if required to testify in the courtroom." (*Craig, supra,* 497 U.S. at p. 842.) "The trial court . . . found that, 'based upon the evidence presented . . . the testimony of each of these children in a courtroom will result in each child suffering serious emotional distress . . . such that each of these

children cannot reasonably communicate.' " (*Id.* at pp. 842-843.) The Court of Appeals reversed the trial court's decision, finding that the state's showing was, under *Coy*, insufficient to overcome the defendant's right to confront the witnesses face-to-face. (*Craig*, at p. 843).

In reviewing this decision, the high court began by observing that there were sufficient assurances of reliability because "the child witnesses . . . testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified." (*Craig*, *supra*, 497 U.S. at 857.) The court next explained that, on the issue of necessity, the Court of Appeals' analysis was "consistent with our holding today" to the extent it stated that a trial court must "make a specific finding that testimony by the child in the courtroom *in the presence of the defendant* would result in the child suffering serious emotional distress such that the child could not reasonably communicate." (*Id.* at p. 858.) However, the high court continued, the Court of Appeals erred insofar as it concluded that a trial court must "observe the children's behavior in the defendant's presence and . . . explore less restrictive alternatives to the use of the one-way closed circuit television procedure." (*Id.* at pp. 859-860.) "Although . . . such evidentiary requirements could strengthen the grounds for use of protective measures, . . . as a matter of federal constitutional law, [there are no] such categorical evidentiary prerequisites for the use of the one-way television procedure. The trial court in this case, for example, could well have found, on the basis of the expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence 'will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate,' [citation]. [Citations.]

So long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case. Because the Court of Appeals held that the trial court had not made the requisite finding of necessity under its interpretation of ' . . . [*Coy*] . . .' [citation], we cannot be certain whether [the state appellate court] would reach the same conclusion in light of the legal standard we establish today.  We therefore vacate the judgment of the [state appellate court] and remand the case for further proceedings not inconsistent with this opinion." (*Craig*, at p. 860.)

In the nearly thirty years since the high court decided *Craig*, we have applied these high court precedents in a relevant context only once — in *Gonzales*.  There, the defendant, in appealing from a murder conviction, argued that the trial court had violated his right of confrontation by admitting at trial a videotape of his son's preliminary hearing testimony. (*Gonzales*, *supra*, 54 Cal.4th at p. 1261.)  As here relevant, the defendant based this claim on the fact that his eight-year-old son, while testifying at the preliminary hearing, had been "seated at an angle, not directly facing the defendant[]." (*Id.* at p. 1265.)  This arrangement, the defendant asserted, was invalid under *Craig* because (1) the preliminary hearing court "fail[ed] to make a case-specific factual finding of necessity" (*id.* at p. 1266), (2) the prosecution, which requested the arrangement because the son "had expressed great fear of [the] defendant" (*id.* at p. 1265), "made no factual showing to support its claim" (*id.* at p. 1266), and (3) "the court's concerns on this point were not based on any information specific to this case" (*ibid.*).  We rejected the claim, explaining first that, because the defendant "had no

[constitutional] right to confront" his son "at the preliminary hearing," "there was no occasion for the preliminary hearing court to make *Craig* findings, and defense counsel did not request them." (*Id.* at p. 1267.) The defendant's argument to the contrary, based on attachment of his confrontation right "when the videotape of the preliminary hearing testimony was introduced," is "particularly artificial." (*Ibid.*)

"In any event," we continued in *Gonzales*, "the claim fails on its merits." (*Gonzales, supra,* 54 Cal.4th at p. 1267.) Although "the preliminary hearing court made no factual findings on the need to shield [the witness] from [the] defendant's gaze, the trial court made extensive findings that the child would be traumatized if he were made to testify at trial. [The] [d]efendant does not dispute the vulnerability of the young witness, either at the time of the preliminary hearing or the time of trial. Indeed, [the] defendant claims that testifying against his father was so traumatic for [the witness] that even the videotape should have been excluded from evidence. . . . [W]e conclude that the seating arrangement for the child witness's testimony was fully justified by the record, and defendant's confrontation rights were not violated when the videotape was introduced at trial. The seating arrangement at the preliminary hearing satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' " (*Id.* at p. 1268.)

## B. F.R.

Based on these authorities, defendant attacks the trial court's ruling as to F.R. on numerous grounds. After noting that F.R. was 18 years old when she testified, he argues that because

there is "no 'transcendent' state interest in protecting adult witnesses as exists for child witnesses," no accommodation was permissible. He also argues that, even were there a compelling state interest at stake, the particular accommodation the court chose was impermissible because it "wholly blocked [his] view of" F.R. and completely precluded him from observing her while she testified. Thus, to the extent any accommodation was necessary, the trial court should have selected a "less restrictive" one that "would have adequately protected" his right of confrontation, such as "rearrang[ing] the courtroom so [F.R.] could look away from" him — as in *Gonzales* — or using a closed-circuit television procedure — as in *Craig*. Procedurally, defendant complains that the trial court failed to hold an evidentiary hearing and to require expert testimony regarding the relevant factors *Craig* sets forth, i.e., whether the defendant's presence would traumatize the witness, whether the witness's emotional distress would be more than de minimis, and whether accommodation is necessary to protect the witness's welfare. He also complains that *Craig* requires express, particularized, case-specific findings on these matters and that the court failed to make such findings. Finally, he argues there was insufficient evidence to support the findings that *Craig* requires to justify an accommodation.

Defendant also makes several related arguments based on section 1347, which, as here relevant, sets forth a procedure for allowing some child witnesses to testify remotely by closed-circuit television "out of the presence of the judge, jury, defendant or defendants, and attorneys" when their testimony will involve reciting the facts of "[a]n alleged sexual offense committed on or with" them. (§ 1347, subd. (b)(1).) As pertinent to defendant's arguments, the statute: (1) requires the

prosecution to give written notice that the accommodation is sought at least three days before the witness is scheduled to testify, unless the court takes up the issue "during the course of the proceeding on [its] own motion" (*id.*, subd. (b)); (2) authorizes the procedure's use only for witnesses "13 years of age or younger at the time of the motion" (*ibid.*); and (3) requires the court to make a finding that it has been "shown by clear and convincing evidence" that testifying in front of the defendant "would result in the child suffering serious emotional distress so that the child would be unavailable as a witness" (*id.*, subd. (b)(2)(a)).

Defendant acknowledges that section 1347 is "not applicable" with respect to F.R. because she was older than 13 when she testified, but asserts that it "defines the extent of accommodations in California" because it reflects "the Legislature's determination as to a proper balance between the defendant's rights and protecting the victim." "[A]t the very least," he asserts, we should "use [it] as the template for any protections offered to traumatized witnesses." Thus, he argues, "in line with" this section, no accommodation was permissible here because F.R. was "over the age of 13" when she testified, the prosecution failed to give written notice of its request for accommodation at least three days before F.R.'s scheduled testimony, and there was not "clear and convincing evidence" that testifying in front of defendant would cause F.R. "trauma so great as to render [her] unavailable." Moreover, even had a proper showing been made, the only "authorized" accommodation, other than rearranging the courtroom so F.R. could look away from defendant, was using the closed-circuit television procedure "set forth in section 1347." The

accommodation the court chose, which completely blocked defendant's view of F.R., was unauthorized and impermissible.

We reject defendant's argument that, in light of section 1347, a court is constitutionally precluded from ordering an accommodation as to witnesses older than 13 years of age, and from ordering an accommodation other than testimony by closed-circuit television. Nothing in the statute's language or legislative history suggests that the particular accommodation the statute sets forth is the *only* permissible accommodation. On the contrary, relevant legislative history indicates that the Legislature enacted the statute in 1985, not to set forth a comprehensive resolution of all confrontation issues, but to address *Hochheiser v. Superior Court* (1984) 161 Cal.App.3d 777, 780, which held that a trial court had "exceeded its authority" *under state law* in allowing a minor, who was the alleged victim of a sex offense, to testify from a separate room by closed-circuit television. The appellate court based its conclusion on "the lack of explicit legislative authority for [the trial court's] order" (*id.* at p. 783), reasoning that a trial court's "inherent powers" (*id.* at p. 787) are insufficient to authorize use of such a "radical innovation," (*ibid.*) and that "explicit statutory authorization" (*ibid.*) was "necessary . . . for such a drastic deviation from settled procedures" (*ibid.*).

Less than a month after *Hochheiser*'s publication, the bill through which the Legislature enacted section 1347 was introduced. (Sen. Bill No. 46 (1984-1985 Reg. Sess.).) One analysis of the bill explained: (1) in *Hochheiser*, the court "found that no statutory authority exists for using closed-circuit television testimony during a trial"; and (2) this bill "was introduced to provide this authority." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 46 (1984-1985 Reg. Sess.), as amended

Jan. 10, 1985, p. 4.) Another explained that "[b]ased on Hochheiser, legislative action is necessary before" courts may use a closed-circuit television procedure for child witnesses. (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 46 (1984-1985 Reg. Sess.), as amended Mar. 11, 1985, p. 3.) Given the statute's language and legislative history, we reject defendant's view that the authorization section 1347 provides for one particular accommodation implicitly precludes any other accommodation, and that the statute reflects the Legislature's view regarding the limit of what is constitutionally permissible.[2]

Supporting this conclusion are decisions affirming use of accommodations other than those section 1347 authorizes. As previously discussed, and as defendant himself acknowledges, in *Gonzales*, *supra*, 54 Cal.4th at page 1265, we affirmed an alteration of the courtroom seating arrangement that placed the witness "at an angle, not directly facing the defendant[]." In *People v. Lujan* (2012) 211 Cal.App.4th 1499, the court affirmed use of a remote, closed-circuit television procedure for a child witness who fell "outside the ambit of section 1347" (*id.* at p. 1506) as it read at the time, concluding that the accommodation stood "on solid constitutional footing" (*id.* at p. 1507) and was a

---

[2] In any event, regarding the latter point, for purposes of evaluating the claim at issue here — that the accommodation violated defendant's federal *constitutional* rights — a legislative determination of what the confrontation clause permits would not bind this court. "[W]hatever the Legislature's intent may have been, 'the ultimate constitutional interpretation must rest . . . with the judiciary.' " (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1209, fn. 6.) The Legislature is free to provide protections that exceed the constitutional minimum, but any decision to do so cannot alter the requirements of the Constitution itself.

proper exercise of the trial court's "constitutionally conferred, inherent authority to 'create new forms of procedures' in the gaps left unaddressed by statutes and the rules of court" (*ibid.*). And in *People v. Sharp* (1994) 29 Cal.App.4th 1772, 1780-1781, the court, citing *Craig*, affirmed use of an accommodation that allowed the prosecutor to sit or stand next to a young victim witness during examination so she could look away from the defense table while testifying, limiting the defendant's view of her to the side and back of her head. These decisions further undermine defendant's argument regarding the exclusivity of the accommodation that section 1347 sets forth.

We need not address defendant's other arguments under section 1347, or his remaining procedural arguments, because we ultimately agree with him that the record before us is insufficient to sustain the trial court's accommodation order. The relevant evidence before us is quite sparse: After entering the courtroom, being directed to the witness stand, and being advised to "step up here," "follow the instructions of" the bailiff, "watch your step as you take the stand," "[s]tay standing" and "raise your right hand" while "the clerk . . . swear[s] you in," F.R. started crying. When the court asked if she "need[ed] a moment," she replied, "I think so." These are the only facts in the record that underlie the court's subsequent statement that F.R. was "unable to proceed at that time." Assuming F.R.'s act of crying and her equivocal response support the court's statement, they provide little support for a finding that the trauma F.R. would have suffered upon testifying in defendant's presence was such that an accommodation abridging defendant's right of face-to-face confrontation was necessary. Indeed, the court also stated for the record that F.R. was able to "get her emotions back in order" after a relatively short break.

Consistent with this observation, as far as the record shows, after the break, F.R. reentered the courtroom, walked to the stand, and took the oath, all with an unobstructed view of defendant and without any apparent emotional difficulty. She also identified defendant during her testimony — stating that she saw him in the courtroom and describing where he was sitting and what he was wearing — again, as far as the record shows, without any apparent emotional difficulty.

Other aspects of the record on which the People rely do little, if anything, to establish the requisite necessity. According to the People, before the prosecution called F.R. as a witness, "[h]er best friend of six years, [M.C.], had already testified that when she confronted [F.R.] about [defendant's] abuse, [F.R.] initially refused to disclose the abuse to her despite the girls' very close relationship." Thus, the People argue, when F.R. first entered the courtroom, "[t]he trial court was already aware that [she] had particular difficulty disclosing the abuse." However, M.C.'s testimony actually cuts against the People's ultimate position, because (1) it indicates that F.R. had difficulty disclosing the abuse to *anyone*, even her best friend, and (2) under *Craig*, an accommodation that abridges the right of face-to-face confrontation is constitutionally permissible only if the harm the witness may suffer from testifying is caused by "the presence of the defendant," "not by the courtroom generally." (*Craig*, *supra*, 497 U.S. at p. 856.) Notably, consistent with what M.C.'s testimony indicates, F.R. mentioned or indicated numerous times during her testimony that she had difficulty telling anyone about defendant's acts, even her mother.[3]

---

[3]    Asked what part of defendant's body was touching her, F.R. replied, "I don't want to say it." Asked why she had testified

Likewise unpersuasive is the People's reliance on the court's exchange with counsel as to whether facing defendant was the cause of F.R.'s emotional difficulty the first time she entered the courtroom. As the People note, after explaining that the monitor had been elevated by placing it on several books, the prosecution added, "Given that the witness had indicated that the defendant looked at her the first time she came in." But the court did not accept the prosecution's unsworn statement, instead commenting, "And whether that happened or didn't, I think it's appropriate." Defendant's counsel then stated that F.R. "began crying before she was even able to see [defendant's] face," and that defendant "made no effort to look at her, intimidate her, or make any kind of eye contact or suggestive contact with her." The court replied: "I understand. I'm not casting any aspersions at this point. But *it* clearly affected her, and I think it's appropriate for the court to take whatever small efforts it can make to make the witness more comfortable

that the events were not still fresh in her mind, she replied, "I don't want to." Asked why she hadn't told anyone what defendant had done, she replied, "I don't know." Asked if she had recently talked to M.C. about the case, F.R. replied, "No. I don't like talking about it." Asked if she was scared about being in court, she replied, "I just don't like being in court." Asked why she had not told M.C.'s mother or defendant's mother about what defendant had done, she replied, "Just didn't want to tell anyone." Asked why she had not earlier told M.C. what defendant had done, F.R. replied, "I was always scared," "It was just no one's business," "It was just something I didn't want to talk about," and "[I]t's still something — I never liked talking about it." F.R. also testified that she was shy with "everyone" other than her mother, and that even though she was "not shy" with her mother, she did not tell her mother at first about defendant's acts because "that's the hardest thing you could ever say to someone" and "it's so hard to say anything like that."

without infringing on any of [defendant's] constitutional rights, and I don't believe that his rights have been infringed on at this point." (Italics added.) Given the court's failure to disagree with defense counsel's statement, the court's stated refusal to "cast[] aspersions," and the court's earlier statement that the accommodation was appropriate "whether [defendant looked at F.R.] or didn't" when she first entered the courtroom, we cannot determine to what the court was referring when the court said "it" clearly affected F.R. In other words, it appears that the trial court expressly declined to resolve the competing accounts offered by the prosecution and the defense, and that it ordered the accommodation without determining whether it was defendant personally, or the courtroom more generally, that upset F.R. In any event, even interpreting this comment as the People suggest — that "it" referred to facing defendant — the circumstance that facing defendant "clearly affected" F.R. when she first entered the courtroom would be insufficient alone to establish the level of emotional trauma *Craig* requires to justify use of an accommodation that abridges a defendant's right of face-to-face confrontation. (Cf. *Craig*, *supra*, 497 U.S. at p. 856 [" 'mere nervousness or excitement or some reluctance to testify' " is insufficient].)

In summary, we cannot conclude here that the accommodation was "fully justified by the record." (*Gonzales*, *supra*, 54 Cal.4th at p. 1268.) To find that an accommodation was constitutionally permissible merely because F.R. — a young adult — started crying the first time she entered the courtroom and the court took a short recess to allow her to compose herself, would give courts license to abridge the right of face-to-face confrontation almost any time a witness breaks down on the stand. This does not appear to be what the high court in *Craig*

had in mind when it cautioned that the constitutional "face-to-face confrontation requirement" may not be "easily. . . dispensed with," and then added that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy." (*Craig, supra*, 497 U.S. at p. 850.) In terms of establishing that necessity, the evidence in the record here falls short.[4]

Regarding prejudice, consistent with our case law, the parties agree that violations of the confrontation clause are subject to the federal harmless error analysis of *Chapman v. California* (1967) 386 U.S. 18, under which reversal is required unless it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159.) In *Coy*, the high court explained that in this context, "[a]n assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an

---

[4] Although our conclusion makes it unnecessary to address defendant's assertion that *Craig* requires express findings, we caution that trial courts normally should make such findings before ordering an accommodation. Among other reasons, because the determinations necessary under *Craig* depend heavily on considerations that are difficult to convey through a paper record, it may be quite difficult for an appellate court to glean adequate implied findings from the record on appeal. Nevertheless, we do not foreclose the possibility that, on some records, the degree and cause of witness distress and the need for accommodation may be so manifest that an accommodation ordered without express findings may survive on appeal.

inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." (*Coy, supra,* 487 U.S. at pp. 1021-1022.) After quoting this explanation, the People do not contend that as to the convictions involving acts against F.R. — counts 3, 4, and 5 — if there was error, it was harmless in light of the evidence aside from F.R.'s testimony; instead, they ask in their brief that we remand the case to allow them an opportunity to retry defendant on those counts or dismiss those counts and resentence defendant. We agree that, as to those counts, the error was not harmless in light of the remaining evidence and that reversal is necessary.[5]

### C. Ar.R and An.R

Regarding Ar.R and An.R, we agree with the People and the Court of Appeal that defendant forfeited his claim under the confrontation clause by failing to object at trial to the repositioning of the monitor during their testimony. As a general rule, a defendant's failure to object to an alleged trial error relieves an appellate court of the obligation to consider the claim on review. (*People v. Romero* (2008) 44 Cal.4th 386, 411.) The reason for this rule is to allow the trial court to correct its

---

[5] At oral argument, the People, contrary to what they stated in their brief, asserted that were we to find the record insufficient to sustain the trial court's order, the remedy should be a remand "to the trial court to make a clearer record" regarding the relevant considerations at this 2015 trial. Given the People's failure to raise this question sooner, and defendant's lack of opportunity to address the question, we decline to consider it. (See *People v. Pena* (2004) 32 Cal.4th 389, 403 [" '[a]n appellate court is not required to consider any point made for the first time at oral argument, and it will be deemed waived' "].)

errors and "to prevent gamesmanship by the defense." (*Ibid.*) We have applied this rule numerous times to find forfeiture of a constitutional right of confrontation claim. (*People v. Riccardi* (2012) 54 Cal.4th 758, 827, fn. 33; *People v. Dement* (2011) 53 Cal.4th 1, 23; *People v. Redd* (2010) 48 Cal.4th 691, 730; *People v. D'Arcy* (2010) 48 Cal.4th 257, 289-290; *People v. Raley* (1992) 2 Cal.4th 870, 892.) As the People argue, had defendant objected to the repositioning of the monitor during the testimony of Ar.R and An.R, "the trial court would have had an opportunity to correct [any] error (by lowering the monitor), or to make additional findings on the record regarding the necessity of the accommodation as to" these witnesses. Because defendant did not object, he has forfeited his claim.

Defendant fails to persuade us that we should "excuse[]" his failure to object because an objection would have been "futile." According to defendant, given the standard the trial court set forth in connection with F.R. — whether defendant "was present and could hear the witnesses" — and the trial court's finding as to F.R., the court "would undoubtedly have made the same ruling as to" Ar.R and An.R, who were "younger witnesses." However, as detailed above, the trial court explained that it had repositioned the monitor during F.R.'s testimony because of "her initial reaction" upon entering the courtroom, i.e., "when she first came in to take the oath, she was unable to proceed at that time." Given this explanation, the record offers no support for defendant's assertion that had he objected, the trial court would have ordered the accommodation simply because Ar.R and An.R were "younger witnesses," without regard to whether they were having difficulty testifying. Defendant's futility argument therefore fails.

Likewise unpersuasive is defendant's alternative argument:  if "further objection was necessary," then his attorney's failure to object constituted "ineffective assistance of counsel."  To prevail on this claim, defendant must show, among other things, that his "counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  In evaluating his claim, we "defer[] to counsel's reasonable tactical decisions" and presume that "counsel acted within the wide range of reasonable professional assistance."  (*Ibid.*)  Thus, defendant " 'must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' "  (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1243, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 689.)  His burden in this regard "is difficult to carry" in this case, because this is a direct appeal and the record does not disclose the reason for counsel's failure to object.  (*People v. Lucas* (1995) 12 Cal.4th 415, 437.)  For those reasons, we may reverse "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation."  (*Mai*, at p. 1009; see *People v. Earp* (1999) 20 Cal.4th 826, 896 ["When . . . defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been ' "no conceivable tactical purpose" ' for counsel's actions"].)  This rule "is particularly apt" where, as here, "the asserted deficiency arises from defense counsel's failure to object.  '[D]eciding whether to object is inherently tactical, and the failure to object will rarely

establish ineffective assistance.' " (*People v. Salcido* (2008) 44 Cal.4th 93, 172.)

Defendant has failed to carry his burden because counsel was not asked why he failed to object, the record does not affirmatively disclose that counsel had no rational tactical purpose for the omission, and we are not convinced there could be no satisfactory explanation. Counsel could have concluded, based on his experience with F.R.'s testimony, that the repositioned monitor — which did not interfere with defense counsel's view of F.R., did not prevent defendant from hearing F.R., did not prevent F.R. from testifying that she saw defendant in the courtroom, and did not preclude F.R. from describing where defendant was sitting and what he was wearing — had no meaningful impact on defendant's right of confrontation or on his ability to assist his counsel, and that any benefit from preventing the accommodation's use for Ar.R and An.R therefore did not outweigh the risk of upsetting them during their testimony and arousing sympathy for them with jurors that might work to defendant's detriment and prejudice his case. In other words, counsel could have concluded, based on his experience with F.R., that taking steps to minimize any trauma to Ar.R and An.R was actually in defendant's best interests. Because this rational tactical reason could account for counsel's failure to object, defendant's ineffective assistance claim fails. And because defendant does not claim that the error with respect to F.R. prejudiced him with respect to the convictions involving acts against Ar.R and An.R, there is no basis to reverse those convictions.

## III. DISPOSITION

For the reasons set forth above, we reverse defendant's convictions on counts 3, 4, and 5, we affirm the remainder of defendant's convictions, and we remand for resentencing on counts 1, 12, and 14 (as the Court of Appeal ordered) and for further proceedings consistent with this opinion.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Arredondo

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted**  XXX 13 Cal.App.5th 950
**Rehearing Granted**

_____

**Opinion No.** S244166
**Date Filed:** December 16, 2019

_____

**Court:**  Superior
**County:**  Riverside
**Judge:**  David A. Gunn

_____

**Counsel:**

Steven A. Torres, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Johnson, Deputy State Solicitor General, Steven T. Oetting, Meredith S. White, A. Natasha Cortina, Meagan Beale and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Kymberlee S. Stapleton for Criminal Justice Legal Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Steven A. Torres
Torres & Torres
3579 East Foothill Boulevard
Pasadena, CA 91107
(626) 836-5855

Annie Featherman Fraser
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9137