Filed 2/10/25  P. v. Sanchez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HUGO NOE SANCHEZ,<br><br>    Defendant and Appellant. | F086981<br><br>(Super. Ct. No. 21CR-01590)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Stephanie L. Jamieson, Judge.

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant and appellant Hugo Noe Sanchez guilty of murder (Pen. Code, § 187, subd. (a)) and that he personally used a firearm (Pen. Code, § 12022.53, subd. (d)).  The court sentenced Sanchez to a total term of 50 years to life imprisonment.  On appeal, Sanchez contends:  (1) the trial court erred by denying his Code of Civil

Procedure, section 231.7[1] objection; (2) the trial court erred by excluding evidence that supported his claim of imperfect self-defense; (3) the prosecutor engaged in prejudicial misconduct during closing argument; (4) cumulative errors deprived him of his due process right to a fair trial; and (5) the trial court misunderstood its discretion with respect to firearm enhancements, as clarified by *People v. McDavid* (2024) 15 Cal.5th 1015 (*McDavid*). We vacate Sanchez's sentence for the trial court to exercise its discretion as clarified by *McDavid* but otherwise affirm.

## PROCEDURAL BACKGROUND

On January 18, 2023, the Merced County District Attorney filed an information charging Sanchez with a single count for the murder of Ramon Bernal Gonzalez (Gonzalez) (Pen. Code, § 187, subd. (a).) The information also alleged an enhancement for personal use of a firearm (Pen. Code, § 12022.53, subd. (d).)

On June 1, 2023, a jury was unable to reach a verdict.

On August 15, 2023, a second jury trial began with the same judge.

On September 5, 2023, the second jury found Sanchez guilty of murder and found true that Sanchez had personally used a firearm.

On October 10, 2023, the trial court sentenced defendant to a total term of 50 years to life as follows: 25 years to life for the murder conviction plus 25 years for personal use of a firearm enhancement. Sanchez filed a notice of appeal the same day.

## GENERAL FACTUAL BACKGROUND

In 2021, Sanchez lived in a home in rural Dos Palos along with Maria Garza and Garza's daughter. Sanchez also allowed 60-year-old Gonzalez to live in an RV on the property and allowed Gonzalez to come into the house to bathe and cook food.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

*Events of April 22, 2021*

On April 22, 2021, Sanchez left for work around 6:00 a.m. Around 10:00 a.m., Sanchez returned home from work because he had forgotten his cellphone. He and Garza exchanged a few words, then she left to visit a neighbor. Sanchez also left and returned to work. Sanchez was gone from work for at most 30 minutes.

Also, sometime around 10:00 a.m., Gonzalez's friend came to visit him. After walking about 15 or 20 feet, the friend saw Gonzalez lying on the ground near his truck. The friend noticed Gonzalez's hat on the ground, blood in Gonzalez's nose, and a pool of blood around Gonzalez's head. The friend called 911 for paramedics, but Gonzalez was dead.

Personnel from the Merced County Sheriff's Office responded to the scene after the paramedics. Gonzalez was lying on his back on the ground with a log under his knees. Gonzalez's hat, cigarettes and a lighter, and a coffee cup with coffee were near the body. It appeared that Gonzalez had been sitting on the log. An autopsy later revealed that Gonzalez died from a single gunshot wound to the head, and no other injuries were detected. After the body was moved, a bullet fragment was found in the pool of blood.

Sheriff's personnel interviewed Garza several times. In part, Garza explained that Gonzalez was a different person when he drank. When he got drunk, Gonzalez had problems with many people and would "bluff." Gonzalez sometimes made Garza feel uncomfortable, and Gonzalez had a gun that he sometimes kept under the driver's seat of his vehicle. Garza also told the detectives that Sanchez had returned home around 10:00 a.m. to get his cellphone. Garza said that she exchanged a few words with Sanchez, and then he left to go back to work.

Sheriff's Detectives Ortiz and Ramirez interviewed Sanchez at his sister's home around 6:00 p.m. that evening. Sanchez told the detectives that he had been at work all day. Sanchez said that he had last seen Gonzalez the night before, but that he had heard

3.

from his sister that someone had hit Gonzalez. Sanchez explained that Gonzalez had been disrespectful and treated him like a woman the previous night. Sanchez said that Gonzalez would drink and had problems with everyone, which could lead to fights. Gonzalez would sometimes act disrespectfully by calling Sanchez "Maria," or try to confuse him, or try to make him go crazy, or treat him like a "whore." Sanchez told the detectives that he would resolve his issues with Gonzalez by talking, but sometimes he would have to say, "don't force me to hit you." Sanchez tried to be respectful of Gonzalez because Gonzalez was older and he viewed Gonzalez like his grandfather, but Gonzalez would still insult him. Sanchez told the police that he had a semi-automatic pistol that his brother had given him for protection, and that sometimes Gonzalez would take this pistol and put it in his (Gonzalez's) car, which caused Sanchez to panic terribly. Sanchez also told the detectives that Garza and Gonzalez would let people come to the house in the early morning hours and that it had something to do with drugs. Eventually, however, after asking how much time the person who hit Gonzalez would get, Sanchez said that he did it, that he had hit Gonzalez.

Sanchez was read his legal rights and continued to speak with the detectives. Sanchez said that he had returned home between 9:00 and 10:00 a.m. to get food. Garza was at home but left shortly after Sanchez arrived. Sanchez had his gun with him and then went to greet Gonzalez and found him sitting on a piece of wood near his truck. Gonzalez said, "Maria come here," and then accused Sanchez of stealing or throwing away his pills/medication. Sanchez told Gonzalez to "chill." Gonzalez made a comment that Sanchez was 30 years old, and he was 60 years old and then said, "you go, or I go." Gonzalez also said, "Do it bastard," or "Give it to me bastard," and that it was going to be the last time. Sanchez said that Gonzalez was dangerous, but he did not want Gonzalez to die. Sanchez wanted Gonzalez to have rest. Sanchez asked the detectives if Gonzalez was dead and admitted shooting Gonzalez one time in the head. Sanchez said he shot Gonzalez for many reasons, including Gonzalez's involvement in a machete incident

4.

against Sanchez, Gonzalez's provocations and disrespect, and the pill-stealing accusation. Sanchez said he did not kill Gonzalez to be evil and that he felt calm about the killing. At different points in the interview, Sanchez said both that he regretted and did not regret shooting Gonzalez. Sanchez also said that the killing of Gonzalez should not have happened, but that it wasn't a mistake. Sanchez told the detectives that he needed to kill six more people (including Garza) who did bad things like hurt kids and torture people, but that he could not do so because he was arrested. Sanchez later told the detectives where he had hidden the pistol, and the detectives retrieved it.

*Sanchez's Trial Testimony*

Sanchez testified in part that when Gonzalez moved in, he was initially very calm and a gentleman. However, Gonzalez would get drunk and become aggressive. Gonzalez would insult and provoke Sanchez, and on two or three occasions he "put hands" on Sanchez and tried to fight. Sanchez would then grab ahold of Gonzalez and tell him to be calm. Sanchez also testified that Gonzalez and Garza would let dangerous people come into his house and these people were armed. Sanchez also occasionally saw Gonzalez with weapons.

On the day he shot Gonzalez, Sanchez testified in part that he came back to his house from work between 9:00 and 10:00 a.m. to get his cellphone and a little food. When Sanchez went inside the house, Garza seemed frightened and said that Gonzalez was mad. Sanchez could hear Gonzalez yelling and hitting something metallic, almost like he had hit the side of the house. Sanchez told Garza to leave, and he retrieved his pistol from under his bed. Sanchez put the pistol in the waist of his pants so that it was visible. Sanchez testified that he grabbed the gun because he thought there might be more people outside because Gonzalez would let people come to the house. Sanchez testified that when Gonzalez saw him, Gonzalez started to walk towards a small log/"piece of wood" and insulted, yelled at, and verbally threatened Sanchez. Gonzalez accused Sanchez of stealing medication. When Sanchez denied stealing, Gonzalez said,

5.

"Don't act stupid, you son of a bitch."  Gonzalez then sat on the log, and Sanchez approached him.  Gonzalez said, "If you don't kill me, I'll kill you," or "Are you going to kill me, or [am I] going to kill you?"  Sanchez testified that he felt very afraid of Gonzalez but did not see that Gonzalez had any weapons.  Sanchez testified that Gonzalez then threw himself at Sanchez and attempted to get the pistol.  Sanchez explained that he and Gonzalez struggled for the pistol, Gonzalez somehow managed to grab it, and as Sanchez was attempting to get the pistol back, it went off.  Gonzalez tripped on the log and fell to the ground.  Sanchez then took the pistol, threw it under his house, and left to return to work.  The struggle lasted only a few seconds.  Sanchez testified that he did not see any blood and did not know if Gonzalez had actually been shot.  Sanchez said that he was worried about Gonzalez, but he did not call for help because he was afraid.  Sanchez also believed that Garza would be at the house if help was needed, and he did not think that Gonzalez had sustained a mortal wound.

## DISCUSSION

### I.    Discriminatory Use of Peremptory Challenge

#### A.    Parties' Arguments

Sanchez argues that the trial court improperly overruled his objection under section 231.7 that race was an improper factor in the prosecutor's decision to exercise a peremptory challenge on Prospective Juror 001876535 ("Juror 17").  The prosecutor explained that Juror 17 expressed distrust of or a negative experience with law enforcement and having a close relationship with someone who had been stopped, arrested, or convicted of a crime.  Sanchez argues that although the trial court recognized that at least one of these reasons was presumptively invalid under section 231.7, the court did not apply the correct standard or identify clear and convincing evidence that would rebut the presumption of invalidity.  Further, Sanchez avers that many of the court's findings were either not supported by substantial evidence or were improperly

6.

considered. Therefore, Sanchez argues that the record shows a substantial probability that race was a factor in the peremptory challenge.

The People argue that the prosecutor did not exercise the peremptory challenge for a presumptively invalid reason; rather, she explained that she exercised the peremptory challenge because of discrepancies between Juror 17's questionnaire answers and his voir dire answers. The People contend that, on the jury questionnaire, Juror 17 only disclosed his grandfather's negative experiences with law enforcement, but during voir dire disclosed that he also had a negative experience with law enforcement. The People contend that the reasons stated by the prosecutor, combined with the trial court's finding, support the ruling that there was not a substantial likelihood that race was a factor in the prosecutor's exercise of the peremptory challenge.

Through a de novo review, we conclude that the trial court properly overruled Sanchez's section 231.7 objection.

## B. Additional Background

During the voir dire process, Juror 17 replaced a prospective juror who was dismissed from the panel. Juror 17 was a 20-year-old Hispanic male who was single, lived in Merced, and was employed by a beverage company as a merchandiser.

### 1. Jury Questionnaire Responses

Juror 17 filled out a questionnaire in preparation for jury service. Relevant to this appeal are his answers to questions 17, 18, 19, and 23. Question 17 asked whether he had ever been arrested or convicted of crime, to which he circled "No." Question 18 asked whether any family member or close friend had ever been arrested or convicted of a crime, to which he circled "Yes" and wrote "drug crimes[,] grandfather[,] California." In response to a sub-question about how that experience influenced his opinions about the police, the district attorney, defense attorney and our justice system and whether he believed his family member was treated fairly, Juror 17 wrote "no not treated fairly." Question 19 asked whether he had ever been the victim of or a witness to a violent crime,

7.

to which Juror 17 circled "No." However, under a sub-question which asked whether his past experiences would affect his ability to be fair and impartial in this case, Juror 17 wrote: "Yes to the justice system[.] I will not be able to give a fair judgment." Finally, question 23 asked whether he, a relative, or close friend had ever had a bad experience with the police and whether he had a positive or negative opinion of the police. Juror 17 responded, "I would say negative opinion."

### 2. Voir Dire Responses

Juror 17 was initially questioned by defense counsel. Defense counsel asked whether Juror 17 or anyone he knew has had a negative experience with law enforcement. Juror 17 answered "yeah." When asked if that person was himself, Juror 17 answered, "Yeah. I would say myself. Yeah." When asked whether he would be able to keep an open mind if law enforcement gave testimony in the case, Juror 17 responded "yeah." Finally, Juror 17 responded that there was nothing about the nature or seriousness of the charges that would prevent him from sitting as a juror in the case.

In addition to the general questions that were asked of multiple jurors including Juror 17, the prosecutor had the following specific exchange with Juror 17:

> "Prosecutor:   Is there anyone here that feels they would not be able to evaluate a civilian's testimony on the same grounds as a – let's say law enforcement officer? Juror number 17?
>
> "Juror 17:   I think I would treat them equally.
>
> [¶] … [¶]
>
> "Prosecutor:   Okay. I know you had mentioned you had personal experience with law enforcement; is that correct?
>
> "Juror 17:   Yeah.
>
> "Prosecutor:   Okay. I don't think that I believe that was in your questionnaire. Is that something you wanted to discuss privately or –
>
> "Juror 17:   No. That's all right.

"Prosecutor: Okay.

"Juror 17: It's not affecting nothing.

"Prosecutor: Okay. Was it recent?

"Juror 17: No. It was just they asked me the question, so I just answered it truthfully right now instead of the question.

"Prosecutor: Okay. So have you had any personal experiences with the courts yourself?

"Juror 17: Not courts. No.

"Prosecutor: But with law enforcement?

"Juror 17: Yes.

"Prosecutor: And when was the last time you've had interaction?

"Juror 17: Last year.

"Prosecutor: Okay. And bad interaction, left you with negative feelings?

"Juror 17: Yeah.

"Prosecutor: Okay. I know there had been mention of a family member having some experience with the courts; is that correct?

"Juror 17: Yeah.

"Prosecutor: And based on that experience, you did not think you would be able to give a fair judgment?

"Juror 17: To talk about the case about that situation, probably not.

"Prosecutor: Okay. And understanding that the Court – you know, we talked about an evaluation of the case can only be based on what's presented here in the courtroom. Would you be able to set aside your feeling?

"Juror 17: I'll try.

"Prosecutor: Okay.

"Juror 17: Pretty sure.

9.

"Prosecutor:    Okay.  And obviously it's important to have jurors that are able to follow the instructions.

"Juror 17:      Yeah.

"Prosecutor:    So if you hear from a law enforcement officer and you're chosen as a juror in this case, would you be able to evaluate their testimony and evaluate them based on the same standard as anyone else?

"Juror 17:      Yeah."

### 3.      For-Cause Challenge

After the parties finished questioning the prospective jurors, the court held an unreported sidebar conference for the parties to challenge jurors for cause.  The prosecutor later described on the record part of the unreported sidebar:

"In regards to the second sidebar regarding for cause, the People had submitted [Juror 17].  The People felt he … was not – the answers he was given in court was not consistent with his questionnaire in regards to his personal experiences with law enforcement.  The questionnaire had said it was associated with his grandfather.

"And the People had attempted to ask further questions in regards to explore more or any potential biases or concerns.  And the juror did not – based on the People's opinion did not appear willing to discuss the information further.  He did answer that he would follow the instructions; however, the People were concerned that the answers he was giving here in court were contrary to what had been put in his questionnaire."

The trial court then explained that it overruled the for-cause challenge "in light of the rehabilitation of that witness at least as far as the answers he provided in his ability to be fair."  The court also noted that the prosecutor had used a peremptory challenge on Juror 17 and that Sanchez's section 231.7 objection had been overruled.

### 4.      Justification for Peremptory Challenge

Following the sidebar, the parties began to exercise their second round of peremptory challenges.  The defense exercised two peremptory challenges, and the prosecutor exercised one challenge when Juror 17 was moved to replace a juror who had

been challenged by the defense. The prosecutor then exercised a peremptory challenge on Juror 17. Defense counsel objected under section 231.7 that Juror 17's Hispanic race appeared to be a factor in the prosecutor's decision to use a peremptory challenge.

The prosecutor expressed personal offense at the section 231.7 objection and explained her reasons:

"I want to make it very clear, your Honor. It has nothing to do with race. I'm actually first generation myself, so I find it highly offensive that although the defense has the right to bring forward this motion under 231.7, there was no questions asked by me that would ever insinuate that I had used a peremptory challenge against that juror based on their race, your Honor. There was nothing asked. There was nothing in the jury questionnaire other – the questions are solely based on their ability to follow the law.

"As I had put forward, your Honor, it was for cause. My concern was I did not feel [Juror 17] was being honest in regards to what they were disclosing here in the courtroom and what was in the questionnaire.

"In regards to question number 18, has any family, close friend of yours ever been convicted of drug crimes? Grandfather not treated fairly. Will your past experiences affect your ability to be fair and impartial? Yes. No. The justice system. I will not be able to give fair judgment. Have you ever been arrested or convicted of a crime? No.

"It was the People's position that based on his answer in regards to the defense's questions that he himself had had contacts in regards to law enforcement where he was the focus of whatever was going on. And it was clarified. Was he talking about himself or was he talking about someone else. And he said myself. The People attempted numerous times to attempt to get further information to understand the discrepancies were presented in the questionnaire and that were presented here in court, your Honor. It was addressed in the sidebar. The People had submitted the juror in regards for cause because it was concerning that the answers in the questionnaire were not coinciding with what was being answered in the courtroom."

In response to a question from the trial court, the prosecutor clarified that she was referring to Juror 17's responses to questions 17, 18, and 19. The prosecutor then wanted defense counsel to explain on the record the basis for her section 231.7 objection. The

11.

court explained that the objecting party is not required to explain their rationale for making a section 231.7 objection. The court further explained that it "empathize[d]" with the prosecutor's objection to defense counsel's invocation of section 231.7 and "empathize[d]" with the prosecutor's anger, but that section 231.7 is broad and not personal.

### 5. Trial Court's Ruling

The trial court explained to the parties the process that it was to follow in ruling on Sanchez's section 231.7 objection. The court then made the following findings: (1) the prosecutor had identified herself as being Hispanic, like Juror 17, which made it less likely that race was a factor in the peremptory challenge; (2) witnesses in the case were Hispanic, which made it less likely that race would be a factor in either party's use of a peremptory challenge; (3) no other juror gave contradictory answers like Juror 17, which supported the prosecutor's stated reasons; (4) there was no history of utilizing peremptory challenges against members of a section 231.7 cognizable group; (5) Juror 17 was not asked cursory questions; (6) Juror 17 was asked about the reason for the challenge, given the opportunity to respond, and refused to do so; (7) although Juror 17 was asked about family associations with law enforcement, that was relevant to the reason for the peremptory challenge because Juror 17's questionnaire responses appeared to be inconsistent with his responses to voir dire questions in court and he refused to elaborate; (8) distrust of the legal system is presumptively invalid, but Juror 17 stated in the questionnaire that he will not be able to be fair; and (9) the venire was composed of multiple individuals who are Hispanic, which made it less likely that race was a factor in the use of the peremptory challenge. For these collective reasons, the court held that there was not a substantial likelihood that an objectively reasonable person would view race as a factor in the prosecutor's exercise of a peremptory challenge on Juror 17.

### C. Legal Standard

Although peremptory challenges generally may be used " ' "for any reason, or no reason at all," ' " there are constitutional and statutory limitations on the use of a peremptory challenge. (*People v. Armstrong* (2019) 6 Cal.5th 735, 765 (*Armstrong*).) Section 231.7 prohibits a party from using a peremptory challenge to remove a prospective juror on the basis of, among other things, that prospective juror's race or perceived race.[2] (§ 231.7, subd. (a); see also *People v. SanMiguel* (2024) 105 Cal.App.5th 880, 888 (*SanMiguel*), review granted December 18, 2024, S287786; *People v. Uriostegui* (2024) 101 Cal.App.5th 271, 279.) If an objection is made under section 231.7 to a party's use of a peremptory challenge, the party who is attempting to exercise the peremptory challenge "shall state the reasons [why] the peremptory challenge has been exercised." (§ 231.7, subd. (c); *SanMiguel*, at p. 888; *People v. Jimenez* (2024) 99 Cal.App.5th 534, 540 (*Jimenez*).) Once the party gives his reasons for the peremptory challenge, the court must evaluate the reasons given, without speculation or assumptions as to the existence of other possible reasons, in light of the totality of the circumstances in order to determine whether an "objectively reasonable person" would conclude that there was a "substantial likelihood" that the prospective juror's race or perceived race was "a factor" in the peremptory challenge. (§ 231.7, subd. (d)(1); *SanMiguel*, at p. 888; *Jimenez*, at p. 540.) The court must explain the reasons for its ruling on the record. (§ 231.7, subd. (d)(1); *Jimenez*, at p. 540.) A "substantial likelihood" is "more than a mere possibility but less than a standard of more likely than not." (§ 231.7, subd. (d)(2)(B); *Jimenez*, at p. 540.) Because a violation of section 231.7, subdivision (a) does not depend on a finding of purposeful discrimination, (§ 231.7, subd. (d)(1); *SanMiguel*, at p. 888), an "objectively reasonable person" is deemed to be "aware

---

[2] Section 231.7, subdivision (a) identifies additional cognizable groups besides race. Because Sanchez contends that only race was an improper factor in the exercise of a peremptory challenge, our discussion of section 231.7 will be limited to race.

that unconscious bias," which includes "implicit and institutional bias," (§ 231.7, subd. (d)(2)(C); *Jimenez*, at p. 540), "in addition to purposeful discrimination, has resulted in the unfair exclusion of potential jurors[.]" (§ 231.7, subd. (d)(2)(A); *SanMiguel*, at p. 888.)

In considering the totality of the circumstances, the trial court may evaluate a non-exclusive list of considerations identified by section 231.7. (§ 231.7, subd. (d)(3); *SanMiguel*, *supra*, 105 Cal.App.5th at p. 888.) Those considerations are: (1) with respect to the challenged juror's race, whether the objecting party is a member of that race, the victim is not a member of that race, and witnesses or parties are not members of that race; (2) whether race or perceived race bears on the facts of the case to be tried; (3) with respect to the questions asked of the challenged juror, whether the party questioned or failed to question the juror on a subject later identified as a reason for challenging the juror, whether the party engaged in cursory questioning of the juror, and whether the party asked different questions or used different phraseology with other jurors on the same topic as compared to the questions asked of the challenged juror; (4) whether jurors of a different cognizable group gave similar answers to the challenged juror but were not challenged; (5) whether a reason given for a peremptory challenge is a reason disproportionately associated with members of the challenged juror's race; (6) whether a reason given for the peremptory challenge was contrary to or unsupported by the record; and (7) whether the counsel or counsel's office has used peremptory challenges disproportionately against the juror's race in the present or past cases or has a history of prior violations under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), section 231.5 or section 231.7. (§ 231.7, subd. (d)(3); *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 884–885 (*Caparrotta*).)

Additionally, section 231.7 provides an extensive list of reasons that are presumed to be invalid, including "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system" and "[h]aving a close relationship with

14.

people who have been stopped, arrested, or convicted of a crime." (§ 231.7, subd. (e); *Caparrotta*, *supra,* 103 Cal.App.5th at p. 885, fn. 5.) This presumption of invalidity may be rebutted by clear and convincing evidence that an "objectively reasonable person" would view the reason as unrelated to the juror's race but instead bearing on the juror's ability to be fair and impartial. (§ 231.7, subd. (e); *Caparrotta*, at p. 885.) For purposes of overcoming this presumption of invalidity, "clear and convincing evidence" exists when the court determines "it is highly probable that the reasons given for the exercise of a peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on the juror's ability to be fair and impartial in the case." (§ 231.7, subd. (f); *People v. Gonzalez* (2024) 104 Cal.App.5th 1, 14 (*Gonzalez*).) Section 231.7 also identifies as presumptively invalid three reasons historically associated with improper challenges: (1) being inattentive, staring, or failing to make eye contact; (2) a lack of rapport or problematic attitude, body language, or demeanor; and (3) providing unintelligent or confused answers. (§ 231.7, subd. (g)(1).) To rebut this presumption of invalidity, the juror's behavior must be confirmed by the court or counsel for the objecting party and counsel must explain why the behavior matters to the case to be tried. (§ 237.1, subd. (g)(2).)

A trial court's denial of a section 231.7 objection is reviewed de novo, with the trial court's express factual findings reviewed for substantial evidence. (§ 231.7, subd. (j); *SanMiguel*, *supra*, 105 Cal.App.5th at p. 889; *Gonzalez*, *supra*, 104 Cal.App.5th at p. 14.) Section 231.7 prohibits appellate courts from imputing to the trial court findings that were not expressly made on the record. (§ 231.7, subd. (j); *Gonzalez*, at p. 14.) Section 231.7 also requires appellate courts to consider only a party's expressly stated reasons for exercising a peremptory challenge. (§ 231.7, subd. (j); *Gonzalez*, at p. 14.) However, section 231.7 "does not limit [an appellate court's] ability to consider undisputed facts in the record that are relevant to the prosecutor's reason or the court's finding[s] during our de novo review." (*Jimenez*, *supra*, 99 Cal.App.5th at p. 544; see

*Gonzalez*, at p. 17.) If it is determined that a section 231.7 objection was wrongly denied, section 231.7 deems the error prejudicial and requires the case to be remanded for a new trial. (§ 231.7, subd. (j); *SanMiguel*, at p. 889.)

### D. Analysis

#### 1. Reasons for the Challenge

The prosecutor gave the following reasons for exercising the peremptory challenge: (1) she did not feel that Juror 17 was being honest because (2) there were discrepancies between his written answers on the questionnaire and his oral answers during voir dire and (3) he refused to elaborate on discrepancies or responses. These reasons are not listed under section 231.7, subdivision (e) or section 231.7, subdivision (g)(1) as being presumptively invalid. Further, pre-section 231.7 authority has recognized that inconsistencies or discrepancies in a prospective juror's answers (*People v. Elliott* (2012) 53 Cal.4th 535, 564–566), as well as a prospective juror's refusal to answer questions (*People v. Howard* (2008) 42 Cal.4th 1000, 1019), are valid reasons to exercise a peremptory challenge. Therefore, the prosecutor was not required to rebut any presumption of invalidity.

Sanchez disagrees with this conclusion and insists that the prosecutor's reasons included two presumptively invalid reasons: expressing a distrust of or having a negative experience with law enforcement (§ 231.7, subd. (e)(1)), and having a close relationship with someone who was arrested or convicted (§ 231.7, subd. (e)(3)). We agree with Sanchez that the prosecutor's explanation included references to questions involving negative experiences with law enforcement or the criminal justice system. However, the prosecutor did not state that the experiences of Juror 17 or his grandfather with law enforcement or the criminal justice system were reasons why she exercised a peremptory challenge, nor did the prosecutor discuss the importance of either Juror 17 or his grandfather actually having negative experiences. Rather, the prosecutor explained that Juror 17's answers to questions involving law enforcement and the criminal justice

16.

system contained discrepancies. That is, the fact that Juror 17 and his grandfather had negative experiences with law enforcement and the criminal justice system was not the salient point; the salient point was that Juror 17's answers or disclosures on the questionnaire and during voir dire were inconsistent.

Sanchez argues that even if there were "valid" reasons for exercising the peremptory challenge, those reasons were based in part on invalid reasons that were "buried" by the valid reasons. We disagree with Sanchez's characterization. The record reflects that the prosecutor gave only "valid reasons" for exercising the peremptory challenge. Concerns about a prospective juror's honesty because of discrepancies or inconsistencies between written and oral answers is a consideration that is separate and apart from the substance of the information being conveyed by the prospective juror. Indeed, if a counsel is uncertain whether a juror is being honest in his or her answers to one area of questioning, counsel may well doubt the veracity of the prospective juror's answers in other areas of questioning. Moreover, discrepancies and inconsistencies can manifest themselves in response to any number of different types of questions. In this case, it just so happened that the discrepancies and inconsistencies manifested from questions involving two presumptively invalid reasons for exercising a peremptory challenge. Simply because the discrepancies and inconsistencies involved questions relating to "presumptively invalid" reasons does not insulate the discrepancy or inconsistency from scrutiny or transform a valid reason into an invalid one.

Sanchez also argues that the trial court found that the prosecutor identified presumptively invalid reasons for the peremptory challenge. We agree that the court appears to have found that the prosecutor relied on the presumptively invalid reason of having negative experiences with law enforcement or the courts. However, we review a trial court's finding for substantial evidence. (§ 231.7, subd. (j).) The reasons given by the prosecutor for the peremptory challenge are quoted verbatim above. The prosecutor stated her reasons for the challenge and further stated that her reasons were substantially

17.

the same as those identified in her attempted "for cause" challenge against Juror 17. The prosecutor never identified or discussed the importance of the fact that Juror 17 and his grandfather had negative experiences with law enforcement and the criminal justice system. Again, the substance of the answers was not the problem; the problem was inconsistencies and discrepancies between Juror 17's written responses and oral answers. Therefore, the court's finding that the prosecutor identified a presumptively invalid reason for the peremptory challenge is contrary to the record and thus, unsupported by substantial evidence. Consequently, the finding is not binding on us. (*Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 790 (*Weitzenkorn*) ["No finding of fact is binding upon an appellate court if it is not supported by substantial evidence."]; *People v. Butler* (2003) 31 Cal.4th 1119, 1127 (*Butler*) [noting that reviewing courts defer to a trial court's factual findings "to the extent they are supported in the record[.]"].)

In sum, the prosecutor identified reasons for the peremptory challenge that were not presumptively invalid.

### 2. Trial Court's Findings in Support of Ruling

Sanchez challenges most of the reasons identified by the trial court for denying his section 231.7 objection. We will assess each of the court's findings separately.

### a. The Prosecutor's Race

Sanchez argues that the trial court improperly considered the prosecutor's race because there is no presumption that members of one race will not discriminate against other members of their own race. We agree with Sanchez that no such presumption exists in case law or under section 231.7. Since 1977, the United States Supreme Court has recognized that members of one cognizable group can discriminate against fellow members of the same cognizable group. (*Castaneda v. Partida* (1977) 430 U.S. 482, 499–500; see also *Wexler v. White's Fine Furniture* (6th Cir. 2003) 317 F.3d 564, 574.) Based on this authority, a counsel's membership in the same section 231.7 cognizable

group as that of a challenged juror is a fact that generally should not be considered by trial courts in assessing a section 231.7 objection.

Nevertheless, the totality of the circumstances in this case do not reflect a simple observation by the trial court that the prosecutor and Juror 17 are both Hispanic. The record reflects that the prosecutor was personally angered and offended by Sanchez's objection because her questions were race-neutral and she herself was first generation Hispanic. In other words, the prosecutor was expressing offense and anger based on her shared race with Sanchez. The prosecutor stated directly that she was offended and requested that the trial court force defense counsel to explain why she was making the section 231.7 objection. Critically, the court commented on the prosecutor's anger and explained that it empathized with that anger. Sanchez's briefing acknowledges the court's comment. It is the prosecutor's observable and apparently undisputed anger and offense, which was based on the prosecutor's shared race as a first generation Hispanic, that takes the circumstances of this case beyond a mere observation that the prosecutor and Juror 17 are Hispanic. (Cf. *Gonzalez*, *supra*, 104 Cal.App.5th at p. 17 [courts may consider undisputed facts in assessing the denial of a section 231.7 objection]; *Jimenez*, *supra*, 99 Cal.App.5th at p. 544 [same].) We think that this personal offense and anger, which was so clear and obvious that the court felt obligated to comment and express empathy, makes it less likely that race would be a factor in the prosecutor's use of a peremptory challenge. Considering the unique circumstance of the prosecutor's reaction, which stemmed from being of the same race as Juror 17, and the court's comments thereon, we cannot hold that the court's finding was improper or unsupported by substantial evidence.

###### b.      Witnesses of the Same Race

The trial court found that Sanchez and many of the witnesses were Hispanic and this fact made it less likely that race would be a factor in any party's exercise of a peremptory challenge. Sanchez does not challenge this finding. Because the reporter's

19.

transcript indicates that most of the witnesses had Hispanic names, we conclude that substantial evidence supports the court's finding.

### c. No History of Improper Peremptory Challenges

Sanchez argues that because the prosecutor did not mention the absence of a history of improper peremptory challenges, the trial court could not rely on this factor. Sanchez misreads section 231.7.

Upon objection, a party must disclose its reasons for exercising a peremptory challenge. (§ 231.7, subd. (c).) Once the party provides its reasons for the peremptory challenge, the court assesses the validity of those reasons to insure that neither explicit nor implicit bias was a factor in exercising the challenge. (§ 231.7, subd. (d).) One of the considerations that may aid the trial court in making this assessment is whether the counsel or counsel's office has a history of improper peremptory challenges. (§ 231.7, subd. (d)(3)(G).) Therefore, the presence or absence of a history of improper peremptory challenges is not a *reason* for exercising a peremptory challenge; it is an evaluative tool used by the court for *assessing the reasons* given by a party for why a peremptory challenge was exercised. No counsel should be expected to disclose as a *reason* for the peremptory challenge something that is meant to be a tool to *evaluate* the reasons given. Accordingly, the failure of the prosecutor to identify the absence of a history of improper peremptory challenges is of no import.

Sanchez also argues that there is nothing in the record to support the finding that the prosecutor and the Merced County District Attorney's Office did not have a history of improper peremptory challenges. This is true. However, section 231.7 does not state that a prosecutor is to present evidence that no such history exists, nor does section 231.7 explain how a trial court is to determine whether a history of improper peremptory challenges exists or does not exist.

We are unsure precisely how a prosecutor would be able to prove the negative that no history of improper peremptory challenges exists. Nevertheless, in other contexts,

20.

courts have recognized that courts may rely on their own knowledge and experience within their jurisdiction. (E.g. *Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009 [recognizing that trial courts may set a reasonably hourly rate for an attorneys' fees award based on their own knowledge and familiarity with the legal market].) Superior courts sit in one county and routinely preside over criminal trials. It is not unreasonable to assume that superior courts are aware of *Batson/Wheeler* or sections 231.5 and 231.7 motions being granted in their county when a counsel's peremptory challenges are found to have been improperly exercised. Further, appellate courts presume that trial courts know the law. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) If an appellate court finds that a counsel/prosecutor or their office in a superior court's county violated section 231.5 or 231.7 or *Batson/Wheeler*, a trial court can be presumed to be aware of that opinion. In the absence of affirmative evidence to the contrary, we believe that a trial court may rely on its own knowledge and familiarity with a counsel or counsel's office, either through prior practice before the superior court or through appellate rulings, to find either the presence or absence of a history of improper peremptory challenges. In this case, the record contains no evidence to suggest that the prosecutor or the Merced County District Attorney's Office has a history of improper peremptory challenges, and there was no objection or argument by defense counsel regarding a history of improper peremptory challenges. Therefore, we accept the court's determination that the prosecutor and the Merced County District Attorney's Office did not have a history of exercising improper peremptory challenges.

### d.    Cursory Questions

The trial court found that Juror 17 was not asked cursory questions. Sanchez does not address this finding. After our own examination of the record, we conclude that substantial evidence supports this finding.

21.

### e. Composition of the Immediate Panel of 18 and the Venire

The trial court found that the immediate panel of 18 jurors, as well as the entire venire, was composed of many Hispanic individuals. Sanchez objects that this finding is improper because the fact that another juror of the same cognizable group as an improperly challenged juror serves on the jury does not sanitize the use of a discriminatory peremptory challenge. We agree that a discriminatory peremptory challenge is not excused simply because a prospective juror of the same cognizable group as an improperly challenged prospective juror is ultimately seated on the jury. (E.g. *Castellanos v. Small* (9th Cir. 2014) 766 F.3d 1137, 1149–1150.) However, we are not dealing with a finding that a peremptory challenge was exercised in a discriminatory manner. Rather, we are determining whether the trial court correctly ruled that there was not a substantial likelihood that race was a factor in the prosecutor's exercise of a peremptory challenge.

Courts have recognized that acceptance of other jurors of the same cognizable group as a challenged prospective juror lessens any inference of discrimination that might otherwise be implied from the prosecutor's pattern of strikes. (*Turner v. Marshall* (9th Cir. 1997) 121 F.3d 1248, 1254 (*Turner*); *People v. Reed* (2018) 4 Cal.5th 989, 1000–1001 (*Reed*); *People v. Collins* (2021) 60 Cal.App.5th 540, 554 (*Collins*).) Of course, *Turner*, *Reed*, and *Collins* addressed situations in which either a panel was chosen or the prosecutor had exercised a substantial number of peremptory challenges. In contrast, the trial court did not and could not discuss the composition of the yet-to-be empaneled jury. Further, there is no argument regarding the prosecutor's first round of peremptory challenges. Nevertheless, if there are multiple members of the same cognizable group in both the immediate prospective jury panel and the entire venire, numerically speaking, we agree that it is less likely that a challenge was based in part on the challenged juror's membership in that cognizable group. (*Turner*, at p. 1254; *Reed*, at pp. 1000–1001; *Collins*, at p. 554.) While we do not believe that the composition of the

22.

immediate jury panel and the venire should necessarily be a weighty consideration, we cannot say that it is not part of the totality of the circumstances or irrelevant to assessing the likelihood that race was a factor in the peremptory challenge. Therefore, in the absence of evidence that multiple Hispanics were not part of the immediate jury panel and the venire as a whole, we cannot conclude that the court's finding was improper or unsupported.

### f. Distrust of the Legal System and the Ability to be Fair

The trial court's finding is somewhat unclear. The court noted that distrust of the legal system is a presumptively invalid reason to exercise a peremptory challenge. The court then explained that distrust of the legal system could be consistent with the notion that a prospective juror would not give a fair judgment precisely because he distrusts the system, and that Juror 17 stated "expressly that he will not be able to be fair."

To the extent that the trial court found that the prosecutor relied on the presumptively invalid reason that Juror 17 distrusted the legal system, the finding is not supported by substantial evidence. As explained above, the prosecutor was concerned about Juror 17's honesty because of perceived *discrepancies or inconsistencies* between his answers during voir dire and his answers on the questionnaire. The prosecutor did not identify a concern with the substance of the answers, that is whether Juror 17 actually had negative experiences with law enforcement or actually held negative views of the legal system. That being said, the prosecutor, in describing concerns over honesty and discrepancies, did state that Juror 17 had answered that he would not be able to give a fair judgment. And Juror 17 did in fact write in response to question 19 on the questionnaire that he would not be able to give a fair judgment in the case. This written answer was contrary to Juror 17's oral responses that he would "try" and was "pretty sure" he could forget about his grandfather's experience with law enforcement and be fair and impartial in this case. We believe Juror 17's different answers to the question of whether he could be fair and impartial are relevant to considering both his veracity and his consistency.

23.

Sanchez notes that Juror 17's answers regarding his ability to be fair and impartial cannot be considered because the trial court denied a challenge for cause on this very basis.[3] It is true that the trial court found Juror 17 had been sufficiently rehabilitated and that a removal for-cause was unwarranted. However, we are aware of no law that holds the denial of a for-cause challenge per se either alleviates all concerns that counsel had in making the for-cause challenge in the first place or prevents a party from then using a peremptory challenge based on substantially the same reasons for the denied for-cause challenge. Such a rule would be contrary to the principle that a peremptory challenge can be made for any or no reason (*Armstrong*, *supra*, 6 Cal.5th at p. 765), and contrary to the law that permits peremptory challenges to be made for reasons that also support a for-cause challenge. (*Gonzalez*, *supra*, 104 Cal.App.5th at p. 15; see also *Armstrong*, at p. 773.) Quite simply, for purposes of a peremptory challenge, counsel is not required to accept the court's conclusion that a prospective juror will be fair and impartial. (See *Armstrong*, at p. 773; *Gonzalez*, at p. 15.) Additionally, we think the fact that the prosecutor attempted to have Juror 17 removed for-cause based on reasons that coincide with the reasons given for the peremptory challenge is significant. The prosecutor's attempted for-cause removal and subsequent exercise of a peremptory challenge indicate that the prosecutor had a persistent concern over the veracity and consistency of Juror 17. Therefore, the court's denial of the for-cause challenge to Juror 17 neither precluded the prosecutor from identifying "for-cause" concerns in her exercise of the peremptory

---

[3] Sanchez correctly notes that the People expressly do not rely on Juror 17's answers to his ability to be impartial in their defense of the peremptory challenge because the trial court denied the prosecutor's challenge for cause. However, we assess whether there was a substantial likelihood that race was a factor through a de novo review (§ 231.7, subd. (j)), and we are not bound by concessions that are contrary to either the law or the record. (*People v. Kimble* (2024) 99 Cal.App.5th 746, 749; *People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1021.)

24.

challenge, nor precludes us from considering Juror 17's responses that also relate to "for-cause" issues.

### g. Refusal to Elaborate

The trial court found that Juror 17 refused to explain or elaborate on discrepancies in his answers to the questionnaire and during voir dire. The entire exchange during voir dire between Juror 17 and the prosecutor is quoted above, and it is not at all clear that Juror 17 refused to elaborate or explain any answers. Juror 17 answered every question that the prosecutor posed to him. The prosecutor did not actually ask for an explanation regarding any discrepancy, nor did the prosecutor expressly ask Juror 17 to elaborate or explain any of his answers. While Juror 17 perhaps could have provided more information when he answered, his answers were nevertheless responsive and appropriate. Succinctly answering is not the same as refusing to elaborate. Therefore, substantial evidence does not support the finding that Juror 17 refused to explain or elaborate on any question, issue, or discrepancy, and we are not bound by this finding.[4] (*Weitzenkorn*, *supra*, 40 Cal.2d at p. 790; *Butler*, *supra*, 31 Cal.4th at p. 1127.)

### h. Discrepancies or Inconsistencies in Juror 17's Answers

Sanchez argues that Juror 17's answers are not inconsistent and that there are no discrepancies. However, a review of the record reflects that there were discrepancies or inconsistencies between Juror 17's oral answers during voir dire and his written answers to the questionnaire. First, Juror 17 clearly wrote that he could not be fair in this case. In

---

[4] We note that the *Caparrotta* court held that if counsel gives a reason that is listed under section 231.7, subdivision (g), that is a reason that has been historically associated with discrimination, and counsel is unable to rebut the presumption of invalidity, then the section 231.7 objection is to be sustained without an analysis under section 231.7, subdivision (d). (*Caparrotta*, *supra*, 103 Cal.App.5th at p. 896.) A "refusal to elaborate," however, is not a presumptively invalid reason under section 231.7, subdivision (g) (or subdivision (e), for that matter). Therefore, an analysis in this case will be made under section 231.7, subdivisions (d) and (j), but without considering a refusal to elaborate by Juror 17. (Cf. *ibid.*)

contrast, after acknowledging his written answer, Juror 17 said that he would "try" and was "pretty sure" he would be able to set aside his hostile feelings regarding his grandfather's experiences and decide the case based only on what was presented during trial. For Juror 17 to first bluntly state that he could not give a fair judgment, but then to state he was "pretty sure" that he could give a fair judgment, is materially inconsistent. Second, Juror 17 disclosed on the questionnaire only his grandfather's negative experience of not being treated fairly regarding a drug conviction which gave the distinct impression that Juror 17 did not himself have any negative experiences. This impression was solidified by Juror 17's response to question 23.[5] As explained above, although question 23 asked about negative experiences with law enforcement by the prospective juror or a relative, and also asked about the prospective juror's opinion of law enforcement, Juror 17 answered only that he had a negative opinion of law enforcement without disclosing his own negative experiences or again referencing his grandfather. Given Juror 17's answer to question 19 and given the nature of question 23, Juror 17's written answers reflect a negative opinion of law enforcement that is based only on his grandfather's experiences, which is inconsistent with his voir dire responses. Therefore, Juror 17's failure to disclose his own negative experience with law enforcement is a discrepancy between his questionnaire responses and his voir dire answers. Finally, and relatedly, after the prosecutor pointed out that Juror 17 had not disclosed his own

---

[5] We recognize that the prosecutor did not reference question 23 when she explained her reasons for the peremptory challenge. While section 231.7 limits review to only a party's expressly stated reasons for exercising a peremptory challenge, (§ 231.7, subd. (j); *Gonzalez, supra*, 104 Cal.App.5th at p. 14), section 231.7 "does not limit [an appellate court's] ability to consider undisputed facts in the record that are relevant to the prosecutor's reason or the court's finding[s] during our de novo review." (*Jimenez, supra*, 99 Cal.App.5th at p. 544; see *Gonzalez*, at p. 17.) Here, Sanchez's opening brief discusses question 23, and there is no dispute about either what question 23 asked or how Juror 17 answered it. Because we find question 23 relevant to the prosecutor's stated reasons for exercising a peremptory challenge, we will consider question 23. (*Jimenez*, at p. 544; *Gonzalez*, at p. 17.)

experiences with law enforcement on the questionnaire and asked some follow up questions, Juror 17 stated that because he had been directly asked about the subject by defense counsel, he "just answered it truthfully *right now* instead of the question." We read Juror 17's response to mean that he answered the defense counsel's direct oral question truthfully as opposed to answering the written question in the questionnaire. Juror 17's statement expressly calls into question his veracity and the completeness and consistency of his disclosures. The answer suggests that he was content to not disclose, and thus, not be truthful about, his own experiences on the questionnaire, but only answered truthfully after he was directly asked orally in court if he himself had negative experiences. For these reasons, we conclude that substantial evidence supports the court's finding that there were discrepancies or inconsistencies between Juror 17's questionnaire answers and his voir dire responses.

### i. Similar Responses by Other Prospective Jurors

The trial court found that no other prospective juror gave answers similar to Juror 17. Sanchez does not address this finding. After our own examination of the record, we conclude that substantial evidence supports this finding.

### 2. Substantial Likelihood that Race was a Factor

The record does not show that Juror 17 refused to elaborate or discuss any issues, including inconsistencies or discrepancies. Nevertheless, substantial evidence supports most of the trial court's findings. The record shows that most of the witnesses were Hispanic; the prosecutor was Hispanic and reacted with anger over the section 231.7 objection because she was first generation Hispanic;[6] Juror 17 was not asked cursory questions; neither the prosecutor nor the Merced County District Attorney's Office had a history of exercising improper peremptory challenges; there were discrepancies and

---

[6] Even if this reason were excluded, we would still conclude that an objectively reasonable person would not conclude that there was a substantial likelihood that race was a factor in the prosecutor's exercise of a peremptory challenge to Juror 17.

inconsistencies between juror 17's answers to the written questionnaire and his answers during voir dire and those discrepancies and inconsistencies reflected on his veracity and ability to be fair; there were multiple Hispanic individuals on the immediate panel and the entire venire; no other jurors gave answers or failed to disclose information in a similar way to Juror 17; and the prosecutor had attempted to challenge Juror 17 for-cause based on essentially the same reasons she gave to support her peremptory challenge. Based on these considerations, and through our own independent review (§ 231.7, subd. (j)), we conclude that an objectively reasonable person would not conclude that race was a factor in the prosecutor's decision to exercise a peremptory challenge on Juror 17. Therefore, the court did not err by overruling Sanchez's section 231.7 objection.

## II. Exclusion of Evidence Relating to Imperfect Self-Defense

### A. Parties' Arguments

Sanchez argues that the trial court erred by excluding evidence in support of an imperfect self-defense theory. During the first trial, Sanchez testified to an incident in which a former housemate attacked him with a machete. During the second trial, the court sustained a relevance objection and excluded all references to the machete incident. Sanchez argues that the court relied on an incorrect legal standard when it considered imperfect self-defense. Sanchez also argues that the court failed to realize that the excluded evidence was relevant to prove his own frame of mind, which was one of hyper-awareness to threats posed by those around him. Sanchez also argues that the issue was not forfeited as the trial court was aware of the relevance of the excluded evidence for an imperfect self-defense theory. In the alternative, Sanchez argues that his counsel was prejudicially ineffective for failing to seek admission of the machete incident under an imperfect self-defense theory.

The People argue that Sanchez sought to admit the machete incident under a perfect self-defense theory, and thus, forfeited any issue regarding imperfect self-defense. With respect to ineffective assistance of counsel, the People argue that counsel was not

constitutionally ineffective. The People argue that the machete incident was not admissible because Gonzalez was not the attacker. The People also argue that Sanchez's statements were so inculpatory that the evidence of the machete incident would not have changed the outcome.

We conclude that Sanchez has forfeited the issue of admissibility of the machete incident under an imperfect self-defense theory and has not demonstrated ineffective assistance of counsel.

**B. Additional Background**

*Machete Attack Evidence*

During the first trial, Sanchez testified he had permitted another person, E.G., to live in his home. Sanchez told E.G. to move out. In January 2021, E.G. attacked and cut Sanchez with a machete. Gonzalez was not the person who attacked Sanchez. Sanchez's foot, arms, and fingers were injured, and the police were called. After the attack, Sanchez's brother gave him a gun for protection. Sanchez testified that he did not tell Gonzalez to leave because he did not want Gonzalez to react like E.G. had reacted when Sanchez told him to leave.

During the second trial, Detectives Ortiz and Ramirez's interview with Sanchez was played to the jury, and the jury was given a transcript of the video interview. Despite the trial court's ruling excluding evidence of the machete incident, the interview included a general reference to Sanchez being attacked with a machete. The interview also included Sanchez saying that Gonzalez was involved in the machete incident and that was one reason he shot Gonzalez.

At sentencing, defense counsel expressed concern about how the sentencing memorandum and probation report treated the machete incident. In part, defense counsel confirmed Gonzalez had not attacked Sanchez with a machete. The prosecutor then stated the sentencing memorandum and probation report incorrectly identified Gonzalez as the attacker, when in fact Gonzalez had intervened to defend and assist Sanchez. The

trial judge confirmed that her understanding was that Gonzalez was not the machete assailant, but was instead "an intervening party in protecting Mr. Sanchez." Defense counsel did not object or contend that the prosecutor's and court's comments about Gonzalez intervening to help Sanchez were incorrect.

*Arguments & Ruling – Second Trial*

Three months before the second trial began, the parties had the following pre-trial exchange related to the admissibility of the machete incident:

"The Court: What is then the relevance of [the machete] incident to your case?

[¶] … [¶]

"Ms. Partin: Well, it certainly could go to that theory of self-defense, Judge. Provided that what he experienced during that time given that it was within a relatively short amount of time following – because that incident occurred in January, and the shooting occurred in April. That would give rise to coloring the defense's theory about -- in regards to a self-defense theory, Judge. I just do think it's relevant.

[¶] … [¶]

"Prosecutor: The People's position is that this is still not relevant. The defendant who attacked Mr. Sanchez has no – no relevance to this case at all, other than when he was mentioned by Mr. Sanchez. He's not a witness. He's not any party. He was not present at the location. He was never interviewed by law enforcement in regards to how we could correlate to self-defense. The only two people that were there were Mr. [Gonzalez] and Mr. Sanchez based on the evidence that was presented.

So the machete incident relevance has nothing to do with what happened on April [22] of 2021, your Honor, so, I still stand by that. I don't think it's relevant. It will confuse the jury. It creates time in regards to evidence being presented, elaborate questions being asked about it. And it has nothing to do about what happened on April [22].

"The Court: In order to establish self-defense, there has to be provocation of some kind. Even for imperfect self-defense, there has to be a reasonable belief in danger. Generally prior incidents of violence are admissible for purposes of establishing a self-defense argument only when the victim of the crime, in this case the decedent, was the attacker, or aggressor in the prior incident causing the defendant to believe that he was in danger or causing the defendant to believe that the victim was of a violent charge or nature.

I don't see any of those pieces here. I did hear the first trial. None of those pieces were presented at that time. Court did give substantial leeway to the defense to establish those pieces, and it never happened.

At this point in time, based upon the information before me right now, the arguments of counsel, and the current witness list, I'm going to grant the motion to exclude evidence of the [machete] attack on the defendant unless and until independent grounds for relevance are established by the defense. I do not preclude the possibility those grounds could be established, but before any such evidence is to be presented to the jury, a hearing will need to be held to determine if the threshold question of relevance and the [Evidence Code section] 352 question of whether that relevance is outweighed by confusion of the jury, or issues has been met.

Anything else on that, Ms. Partin?

"Ms. Partin: No, Judge."

*Jury Instruction Conference – First Trial*

During the first jury trial, the parties discussed the propriety of various self-defense related instructions. Over objection from the prosecutor, the trial court agreed to give CALCRIM 505 for perfect self-defense. After addressing other instructions, the parties and the court had the following exchange:

"The Court: [S]o the self-defense instructions, Ms. Partin, are given if there's sufficient evidence, but also if it's not inconsistent

31.

with the defense's theory of the case. Your client did testify that during the altercation, the gun went off. That would tend to support an instruction of involuntary manslaughter, but that would be inconsistent with self-defense. So as far as how the jury's instructed, I believe the defense would need to elect a theory.

"Ms. Partin: *Well, we are arguing self-defense, Judge.* Is this Court not inclined to include the voluntary manslaughter of *imperfect self-defense*?

"The Court: I just think that an election has to occur, because the only way that the defense is entitled to these instructions is not just if there's sufficient evidence, but there must be sufficient evidence as well as the fact that it not be inconsistent with the *defense*.

"Ms. Partin: Of *self-defense*.

"The Court: Or if you wanted the instruction on involuntary manslaughter, because [the prosecutor] does raise a point of your client's testimony that the gun went off. Whether that's going to give rise to an argument of involuntary manslaughter or not is not something that the Court knows.

"Ms. Partin: I'm not asking for involuntary manslaughter.

"The Court: All right. So it's conceded that that would be inconsistent with the instructions of self-defense.

"Ms. Partin: Right, Judge.

"The Court: All right. As far as [CALCRIM] 571 is concerned, I agree there's no evidence of defense of another. In light of the instructions with regard to *self-defense*, it would be appropriate to also provide *imperfect self-defense* because if the jury doesn't find that Mr. Sanchez's belief in the danger to his safety was reasonable, they may still find that it was an actual belief by the defendant. They may find *imperfect self-defense*. All right. Are there any other objections or comments with regard to the jury instructions that need to be noted?

"Ms. Partin: No." (Italics added.)

32.

*Defense Closing Argument – First Trial*

Defense counsel began her closing argument by quoting the purported words of Gonzalez, "If you don't do it, I'm going to kill you." Counsel then stated, "This case is about self-defense." After briefly discussing the first-degree murder instruction, counsel explained that Sanchez "is not guilty of murder if he was justified in killing someone in [self-]defense. That's why we have it as a legal term." Counsel explained that the jury could consider the past threats made or harms inflicted by Gonzalez in deciding whether Sanchez's "conduct and beliefs were reasonable." Counsel later informed the jury that the court allowed for an instruction on "imperfect self-defense as well," but counsel simply encouraged the jury to look at the instruction. Counsel also informed the jury that Sanchez himself did not use the legal term "self-defense," but he nevertheless was trying to explain to the police and jury that he was acting to defend himself. Finally, defense counsel informed the jury that, "Mr. Sanchez did it as self-defense," and asked that Sanchez be found "not guilty."

*Defense Closing Argument – Second Trial*

During the second closing, defense counsel again began with the purported death threat Gonzalez made to Sanchez. In part, defense counsel told the jury that they would need to determine whether elements were met and to start with voluntary manslaughter. Defense counsel told the jury that "voluntary manslaughter also includes self-defense and imperfect self-defense." However, counsel did not mention imperfect self-defense again. Defense counsel argued that the physical evidence was consistent with a quick struggle as described by Sanchez. Defense counsel argued that the "only thing that makes sense [is] that was done in self-defense." Defense counsel argued that the evidence reflected that Sanchez was provoked and forced into acting in self-defense. Defense counsel concluded by stating that Sanchez was "not guilty" because "[t]he only thing, reasonable conclusion, is that on that day [Sanchez] was provoked [into] committing self-defense."

33.

### C. Legal Standards

#### 1. Forfeiture

" 'As a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the "substance, purpose, and relevance of the excluded evidence[.]" ' " (*People v. Morrison* (2004) 34 Cal.4th 698, 711; see Evid. Code, § 354, subd. (a)(1); *People v. Wilson* (2024) 16 Cal.5th 874, 923 (*Wilson*).) The purpose of this rule " ' "is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected," ' " because " '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' " (*People v. McCullough* (2013) 56 Cal.4th 589, 593; see also *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) Although this requirement is construed " 'reasonably, not formalistically,' " (*Wilson*, at p. 924), the "failure to raise [a particular] theory of admissibility at trial forfeit[s] the claim on review." (*People v. Pearson* (2013) 56 Cal.4th 393, 470, fn. 10 (*Pearson*).) "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*); *People v. Fruits* (2016) 247 Cal.App.4th 188, 208.)

#### 2. Ineffective Assistance of Counsel

The Sixth Amendment guarantees the " 'right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).) "A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." (*Buck v. Davis* (2017) 580 U.S. 100, 118 (*Buck*); see also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*).) A deficient performance is one in which counsel fell below an objective standard of reasonableness under prevailing professional norms. (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 (*Arredondo*).) There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance.  (*Cullen v. Pinholster* (2011) 563 U.S. 170, 189 (*Cullen*); *In re Long* (2020) 10 Cal.5th 764, 773.)  It is also strongly presumed that counsel made all significant decisions in the exercise of reasonable professional judgment.  (*Cullen*, at p. 189; *People v. Padilla* (1995) 11 Cal.4th 891, 935.)  Further, courts will defer to counsel's reasonable tactical decisions.  (*Arredondo*, at p. 711; see also *Cullen*, at pp. 195–196.)  Prejudice occurs where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant.  (*Cullen*, at p. 189; *People v. Woodruff* (2018) 5 Cal.5th 697, 761 (*Woodruff*).)  In turn, a "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  (*Cullen*, at p. 189; *Woodruff*, at p. 762.)

Ineffective assistance of counsel claims should generally be pursued through habeas corpus proceedings.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 (*Nguyen*); *People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)  This is because on direct appeal, a court may find deficient performance only if:  (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  (*Johnsen*, *supra*, 10 Cal.5th at p. 1165; *Mai*, at p. 1009.)  If counsel's tactics or strategic reasons for challenged decisions do not appear on the record, courts will not find ineffective assistance of counsel unless there could be no conceivable reason for counsel's acts or omissions.  (*Johnsen*, at p. 1165; *Nguyen*, at p. 1051.)  Given this framework, "[r]arely is ineffective assistance of counsel established on [direct] appeal since the record usually sheds no light on counsel's reasons for action or inaction."  (*Woodruff*, *supra*, 5 Cal.5th at p. 736.)

### 3. Imperfect Self-Defense

Imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he is in imminent danger of great bodily injury or death.  (*People v. Thomas* (2023) 14 Cal.5th 327, 386 (*Thomas*).)  " 'To satisfy the imminence requirement, "[f]ear

of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." ' " (*People v. Steskal* (2021) 11 Cal.5th 332, 345.) For imperfect (as well as perfect) self-defense, "the defendant must actually associate the threat of imminent danger of death or great bodily injury with the victim." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 689; see *People v. Aris* (1989) 215 Cal.App.3d 1178, 1185, 1188–1189; see also *People v. Minifie* (1996) 13 Cal.4th 1055, 1065.) Because imperfect self-defense negates a defendant's malice, it reduces an unlawful intentional killing to voluntary manslaughter, which is a lesser included offense of murder. (*Thomas*, at p. 386.)

### D. Analysis

#### 1. Forfeiture

Sanchez's defense counsel was asked how the machete incident was relevant to the case. Defense counsel responded it was relevant "to that self-defense theory" and "to a self-defense theory." We believe that defense counsel's response is clarified largely by the events of the first trial, which was presided over by the same judge as the second trial.

As shown above, at the first trial's jury instruction conference, Sanchez requested and obtained CALCRIM 505, which is an instruction for perfect self-defense. Subsequently, when discussing voluntary manslaughter, defense counsel expressly stated that Sanchez was pursuing a "self-defense" theory and then asked the court whether the court was inclined to give an "imperfect self-defense" instruction. After confirming that Sanchez was pursuing a "self-defense theory," the court then stated that, in light of the "self-defense" instruction that would be given, it would also give CALCRIM 571 on "imperfect self-defense." Additionally, during closing argument, defense counsel mentioned the term "imperfect self-defense" one time in reference to the instructions and without elaboration, but several times explained that the case was about self-defense and the reasonableness of Sanchez defending himself. Finally, during the second trial closing

statement, defense counsel used the terms "self-defense" and "imperfect self-defense" together in the same sentence. However, defense counsel mentioned "imperfect self-defense" only once and without elaboration, and then proceeded to argue to the jury that "self-defense" was what had occurred and was the only theory that "made sense" based on the testimony and the physical evidence.

From the above, it is clear that defense counsel and the trial court used the term "self-defense" to refer to "perfect self-defense," and when imperfect self-defense was at issue, defense counsel and the court used the term "imperfect self-defense." Therefore, when defense counsel explained at the second trial that the machete incident was relevant to "that self-defense theory" or "a self-defense theory," defense counsel was referring to "perfect self-defense" and the "perfect self-defense" theory that she had pursued during the first closing statement.[7]

The problem for Sanchez is that "perfect self-defense" and "imperfect self-defense" are distinct theories that have drastically different effects if established. (*Thomas*, *supra*, 14 Cal.5th at pp. 385—386.) "Perfect self-defense" is a complete defense that involves a reasonable apprehension of imminent harm, justifies a homicide, and results in a full acquittal; imperfect self-defense negates the element of malice based on an unreasonable apprehension of imminent harm, which compels an acquittal for murder, but still results in a conviction for voluntary manslaughter. (See *ibid.*; *People v. Randle* (2005) 35 Cal.4th 987, 996 (*Randle*), overruled on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) Because "perfect self-defense" and "imperfect self-defense" are separate defensive theories, defense counsel's reliance on

---

[7] Although we believe that the record clearly shows that defense counsel only explained that the machete incident was relevant to a "perfect self-defense" theory, to the extent that the record is ambiguous, we resolve that ambiguity against Sanchez. (*People v. Moore* (2021) 68 Cal.App.5th 856, 866; *People v. Clifton* (1969) 270 Cal.App.2d 860, 862.)

only perfect self-defense to establish relevance forfeits the issue of the machete incident's relevance to an imperfect self-defense theory. (Evid. Code, § 354, subd. (a)(1); *Pearson*, supra, 56 Cal.4th at p. 470, fn. 10; see also *Partida*, *supra*, 37 Cal.4th at p. 435.)

We agree with Sanchez that the trial court made an erroneous statement of law with respect to imperfect self-defense in the process of ruling on the People's objection to the machete incident. Unlike perfect self-defense, imperfect self-defense does not require that a defendant have a reasonable belief of imminent danger. (*Thomas*, *supra*, 14 Cal.5th at p. 385.) Nevertheless, it is apparent that the court believed that the relevance of the machete incident was tied to perfect self-defense because defense counsel identified only "self-defense" as the basis for relevance. As discussed above, defense counsel and the court both used the term "self-defense" as shorthand for "perfect self-defense." This is confirmed by the fact that the trial court used both the term "self-defense" and "imperfect self-defense" in the same paragraph of its ruling, which is a recognition of the separateness of the two theories. Because the basis for relevance identified by defense counsel was perfect self-defense, the court's brief statement was wholly extraneous. Moreover, there was no attempt by defense counsel to discuss the requirements of imperfect self-defense or how the facts of the case would support or fit within the imperfect self-defense doctrine. In the absence of an argument by defense counsel that expressly raised the issue of "imperfect self-defense" and clearly explained the relevance of the machete incident to an "imperfect self-defense" theory, we do not think that the court's erroneous, unnecessary, and offhand remark regarding "imperfect self-defense," is sufficient to show that the court was adequately apprised that Sanchez was attempting to admit the machete incident under an imperfect self-defense theory.

In reply, Sanchez contends that any further objections or proffers would have been futile because the trial court made it clear that it would only reconsider its ruling if Sanchez could somehow demonstrate Gonzalez's involvement in the machete incident.

38.

We agree that futility is a recognized exception to the forfeiture doctrine. (Evid. Code, § 354, subd. (b).) However, we are not satisfied that the futility exception applies.

In making its ruling, the trial court stated that it was willing to reconsider admissibility if defense counsel could point to "independent grounds for relevance." This is consistent with a later statement that the court made during the same pre-trial hearing with respect to other evidence proffered by Sanchez that had been excluded. The court informed defense counsel that, "In the event there is other authority on the issue that is to the contrary, as I have consistently said, feel free to bring it to my attention. There could be a lot out there that I'm not aware of, and I would reconsider my ruling if presented with the relevant law." Together, we believe that these statements clearly show that the court was willing to reconsider its admissibility rulings, consider authority that may be contrary to its exclusionary orders, and correct its errors. Because the court's statement regarding imperfect self-defense was extraneous, was made in the absence of any argument by defense counsel regarding imperfect self-defense in general or as applied to the facts of the case, and could easily be shown to be incorrect through minimal research, the record demonstrates that the court would have considered admitting the machete incident in support of a defense of imperfect self-defense. Therefore, Sanchez has not shown that invocation of imperfect self-defense would have been futile.

Sanchez points out that after sustaining an objection by the prosecutor that part of Sanchez's testimony improperly related to the machete incident, the trial court asked if defense counsel wanted to request an Evidence Code section 402 hearing. The court then reminded the parties that its "ruling was that at this point in time, the machete incident is not relevant. The only way it could become relevant foreseeably would be if the defense were to assert self-defense, which would only be viable with that machete incident if Mr. [Gonzalez] were an active participant in the attack, or an aggressor in that attack. If the defense believes they have sufficient evidence, at that point we can have a 402 hearing." The court's statement focuses on self-defense because that was the only basis

39.

for admissibility that had been identified by defense counsel. The court's statement does not discuss imperfect self-defense or any other theory. Moreover, the court's use of the term "foreseeably" suggests that the court would be open to avenues of admissibility which it had not foreseen. Such an interpretation is consistent with the court's statements that were made three months earlier and contemporaneously with its exclusion of the machete incident that it would be willing to reconsider based on other undisclosed theories or contrary case law. We cannot conclude that the court's statement demonstrates that invocation of an imperfect self-defense theory would have been futile.

In sum, Sanchez has forfeited the issue of the machete incident's relevance to an imperfect self-defense theory.

### 2. Ineffective Assistance of Counsel

The record does not reflect why defense counsel failed to seek admission of the machete incident for purposes of imperfect self-defense. As a result, we will not find ineffective assistance of counsel unless there could be no conceivable reason for counsel's acts or omissions. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165; *Nguyen*, *supra*, 61 Cal.4th at p. 1051.) We can conceive of a rational reason for counsel's omission.

A defendant retains the right under the Sixth Amendment to make fundamental choices about his own defense, such as whether to pursue defensive theories based on innocence. (See *McCoy v. Louisiana* (2018) 584 U.S. 414, 422–424, 428; *People v. Frazier* (2024) 16 Cal.5th 814, 860.) Counsel is to devise and explain strategies to a defendant in order to obtain the defense objectives, but counsel retains the ability to conduct trial management, which includes deciding which arguments to make and deciding what evidence to try to admit. (*McCoy*, at pp. 422–423; *Frazier*, at p. 860.) Stated differently, once a defense is chosen, trial counsel is the "captain of the ship" and decides how to present that defense to the jury. (See *People v. Poore* (2022) 13 Cal.5th 266, 307.) We strongly presume that defense counsel reasonably made all significant decisions and generally will defer to counsel's tactical decisions. (*Cullen*, *supra*,

40.

563 U.S. at pp. 189, 195–196; *Arredondo*, supra, 8 Cal.5th at p. 711; *Padilla*, *supra*, 11 Cal.4th at p. 935.)

In this case, it is clear that the defense strategy was to defend Sanchez under a perfect self-defense theory. Defense counsel plainly told the court during the jury instruction conference that they were pursuing perfect self-defense, and defense counsel's closing statements focused on perfect self-defense. It is true that in both the first and second closing statements, defense counsel referenced imperfect self-defense. However, each time there was only a single reference, and the reference amounted to little more than an acknowledgement that the trial court had given an instruction on that theory. Defense counsel did not explain what imperfect self-defense was, how it would operate in this case, or how the facts of the case may support a conclusion that Sanchez acted in imperfect self-defense. In contrast, both of defense counsel's closing arguments conveyed to the jury that Sanchez acted in self-defense, Sanchez acted reasonably under the circumstances and in light of his knowledge of Gonzalez, self-defense was the theory that best explained the evidence and testimony, and that the jury should return a "not guilty" verdict. Such a verdict is not possible with imperfect self-defense. (Cf. *Randle*, *supra*, 35 Cal.4th at p. 996 [explaining the different legal effects of perfect self-defense and imperfect self-defense].) Therefore, the operative defensive strategy was the pursuit of perfect self-defense, which is consistent with a decision to maintain Sanchez's innocence.[8]

Because perfect self-defense appears to have been the defense strategy, it was reasonable for counsel to seek to admit evidence that would support that specific theory.

---

**[8]** We note there is nothing in the record that shows Sanchez did not wish to pursue perfect self-defense or did not want to maintain his innocence and seek an acquittal. (Cf. *McCoy*, *supra*, 584 U.S. at 428 [finding a Sixth Amendment violation when counsel admitted the defendant's guilt after the defendant clearly insisted on his innocence]; *People v. Villa* (2020) 55 Cal.App.5th 1042, 1055 [finding no Sixth Amendment violation where the defendant did not voice any objection to the defense strategy].)

Once the trial court determined that the machete incident would not be admitted in support of the perfect self-defense theory, counsel could have reasonably decided not to seek admission of the machete incident at all because the evidence would not sufficiently further the defense's objective of an acquittal. First, unlike other evidence that indicated Gonzalez could be belligerent and dangerous, the machete incident does the opposite. Gonzalez did not participate in the machete attack and actually intervened to help Sanchez. Far from imputing any form of danger to Gonzalez, the machete incident could be viewed as showing that Gonzalez cared about Sanchez and was not a danger to him. Thus, in the three month interim between the exclusionary ruling and trial, defense counsel could have reevaluated the evidence and decided that its probative value was low. Second, if defense counsel had continued to seek admission under an imperfect self-defense theory, she would have limited the jury's consideration of the machete incident to only imperfect self-defense. Defense counsel could have concluded that it was not advisable to admit the machete incident in a way that would highlight a defensive theory that would not result in a complete acquittal and that could well distract the jury away from the theory of innocence by operation of perfect self-defense.

Given these considerations, as well as the strong presumptions in favor of defense counsel's representation and tactical decisions, we cannot conclude that defense counsel's decision to seek admission of the machete incident based only on a perfect self-defense theory was deficient. (See *Cullen*, *supra*, 563 U.S. at pp. 189, 195–196; *Johnsen*, *supra*, 10 Cal.5th at p. 1165; *Arredondo*, *supra*, 8 Cal.5th at p. 711; *Padilla*, *supra*, 11 Cal.4th at p. 935.) In the absence of a deficient performance, there can be no ineffective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at p. 697; *People v. Camino* (2010) 188 Cal.App.4th 1359, 1377 (*Camino*).)

## III. Prosecutorial Misconduct

### A. Parties' Arguments

Sanchez argues that the prosecutor twice engaged in prejudicial misconduct during the closing argument. First, the prosecutor improperly argued that Sanchez acted with deliberation and premeditation by leaving Gonzalez's body out for so long in the sun that Gonzalez's skin peeled, even though the prosecutor knew that law enforcement was responsible for leaving Gonzalez's body out in the sun. Second, the prosecutor misconstrued testimony from a criminologist regarding a malfunction in Sanchez's pistol to improperly argue that Sanchez reloaded the pistol after Gonzalez was shot. Sanchez argues that the comments were prejudicial and require reversal. Sanchez also argues that the issue was not forfeited because a corrective instruction would have been ineffective. In the alternative, Sanchez argues that he received ineffective assistance of counsel if the prosecutorial misconduct issues were forfeited.

The People argue that Sanchez forfeited the issue of prosecutorial misconduct because defense counsel did not object. The People also argue that the failure of defense counsel to object was not unreasonable because the statements at issue were fair comments on the evidence. Finally, the People contend that even if there was deficient performance, there was no prejudice in light of Sanchez's own inculpatory testimony.

We conclude that Sanchez has forfeited the issue of prosecutorial misconduct and failed to demonstrate ineffective assistance of counsel.

### B. Additional Background

*Evidence Admitted During Trial*

#### 1. Dr. Super

Dr. Mark Super, the now retired Merced County Coroner, testified about his findings and observations of Gonzalez's body. In relevant part, Dr. Super testified:

> "So this photograph was taken during the portion of the autopsy where the body's been cleaned. So now we're seeing his right side of his

43.

head and shoulders after he's all been cleaned. … This was a small caliber wound so the hole isn't big. What we also see in the picture is a lot of areas where his skin has slipped off, and that was due to sunburn while he's dead. So the skin is injured by the radiant sunlight and that caused injury to the skin."

### 2. *Criminalist Hamiel*

James Hamiel, a criminalist with the Department of Justice, examined Sanchez's gun. Hamiel concluded that the gun did not function normally. Hamiel explained:

"So on trying to cycle inner cartridges through it to check how the weapon was functioning, it would not extract a cartridge from the chamber after it was put in the chamber. So if you were to fire this with live ammunition, it would fire one shot and then it would jam up and then you would have to manually remove the magazine and manually clear the expended cartridge cases from the chamber, then put the magazine back in, chamber another round, then you could fire one more cartridge."

[¶] … [¶]

"So after it's been fired once, the expended cartridge case remain[s] in the chamber, would not be automatically extracted by the firearm itself. You would have to remove the magazine out of the firearm. You'd have to pull the slide open. And then you'd have to get a fingernail, screwdriver, or something in there to hook the rim of the cartridge case and remove it from the chamber. [And these steps would have to be done before a second round could be chambered in the firearm.]"

### 3. *Detectives Ramirez & Ortiz*

Detective Ramirez testified that, after Sanchez told him where it was located, Ramirez retrieved the pistol. Ramirez testified that he observed a partially loaded 10-round magazine and a jam in the chamber of the pistol. The magazine had eight bullets, and counting the one that was jammed in the chamber, Ramirez testified that nine "bullets" were found in the pistol.

Detective Ortiz testified that he sent items of evidence to be tested by a crime lab. Specifically, Ortiz sent a "DNA sample of Mr. Sanchez, along with the firearm, *the live*

44.

*cartridge that was found in the firearm*, and then the live cartridges that were found in the magazine in the firearm."  (Italics added.)

*Prosecutor's Closing Argument*

The prosecutor three times commented on Gonzalez's skin peeling from sun exposure:

> "Every step that he took when he went back to where Mr. [Gonzalez] was a choice that he made.  When he had his firearm on him, that was a choice he made.  When he took the firearm out, that was a choice that he made.  When he pulled the trigger, that was a choice that he made.  When he left Mr. [Gonzalez] out in the sun for such a long period that his skin started to rub off because of heat exposure and sun exposure, it was willful, premeditated, and deliberate."

[¶] … [¶]

> "And [Dr. Super] explained to you how an autopsy is conducted, an internal and external examination, the dirty state of the body where they observe the body in its natural state.  The blood, Mr. [Gonzalez] had all over his face, a pool of blood surrounding his head area, the hat nearby him, the peeling of skin because of the exposure to the sun."

[¶] … [¶]

> "That's the evidence that was presented to you, the evidence that objectively regardless of what was said on that stand by any witness in this case shows Mr. [Gonzalez] was sitting prior to him being shot, the blood spatter, the blood across his face, the peeling of his skin because he had been exposed to sun.  Mr. Sanchez wants you to believe that because somebody could come out to the property he was bound to be found."

With respect to the pistol used by Sanchez, the prosecutor made the following comments:

> "You also heard evidence from James Hamiel.  He's a senior criminalist with the Department of Justice.  He examined the firearm, the gun that belongs to Mr. Sanchez.  And he explained to you that when he was examining the firearm, he identified a malfunction, a malfunction associated that when the firearm and its – the trigger is pulled and the firearm is used, he explained every step that must be taken for another round to be loaded because the casing remains – it didn't eject it.  He

45.

explained having to manually remove the casing, taking out the clip, loading the clip again, every step that must be taken and that firearm had another round loaded in the chamber.

"And yet when confronted with this information as to how the round ended up in the chamber, Mr. Sanchez couldn't provide an explanation. He had no idea. The only way another round could have been chambered into the firearm based on the testimony of Mr. Hamiel was every one of those steps had to have been taken."

## C. Legal Standard

Prosecutorial misconduct will violate the federal Constitution if it " ' " 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process,' " ' " but will violate California law only if it involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court to or the jury.' " ' " (*People v. Camacho* (2022) 14 Cal.5th 77, 126.) Prosecutors are given wide latitude to vigorously argue their cases and to make fair comment on the evidence, including making reasonable inferences or deductions that may be drawn from the evidence. (*People v. Dworak* (2021) 11 Cal.5th 881, 910 (*Dworak*); see also *People v. Lewis* (1990) 50 Cal.3d 262, 283 (*Lewis*) [noting that a prosecutor has the right to "fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper"].) While prosecutors may attack the defense's case and argument through "pungent language" (*People v. Krebs* (2019) 8 Cal.5th 265, 342), and comment upon the credibility of witnesses based on facts contained in the record (*People v. Peoples* (2016) 62 Cal.4th 718, 796), the prosecutor cannot misstate facts (*People v. Powell* (2018) 6 Cal.5th 136, 183; *People v. Hill* (1998) 17 Cal.4th 800, 823 (*Hill*) ["A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' "]), misstate the law generally (*People v. Bell* (2019) 7 Cal.5th 70, 111 (*Bell*)), argue facts or inferences not based on the evidence presented (*Lewis*, at p. 283), or lead a jury to believe a fact that he or she knows is untrue (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1105 (*Bittaker*); see also *Armstrong*, *supra*, 6 Cal.5th at

p. 797 ["What an advocate cannot do is knowingly mislead  the jury."].)  To establish misconduct, a defendant need not demonstrate bad faith by the prosecutor.  (*Bell*, at p. 111.)  " 'A defendant asserting prosecutorial misconduct must … establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 204 (*Fayed*).)

" ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 72 (*Parker*); see also *People v. Maciel* (2013) 57 Cal.4th 482, 541.)  " 'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943 (*Hoyt*).)

### D.    Analysis

#### 1.    Prosecutorial Misconduct

Sanchez's counsel did not object to either the prosecutor's comments regarding the loaded pistol or Gonzalez's skin peeling from sun exposure.  Contrary to Sanchez's arguments, and as explained more fully bellow, the record does not demonstrate that an objection would have been ineffectual.  (*Johnsen*, *supra*, 10 Cal.5th at pp. 1164–1165; *Hoyt*, *supra*, 8 Cal.5th at pp. 942–943.)  Therefore, the issue has been forfeited.  (*Parker*, *supra*, 13 Cal.5th at p. 72; *Johnsen*, at p. 1165; *Hoyt*, at pp. 942–943.)

#### 2.    Ineffective Assistance of Counsel

##### a.    Pistol Comments

Detective Ramirez testified that nine "bullets" were found in the pistol, eight in the magazine and one that was jammed in the chamber.  A "bullet" is "a round or elongated missile (as of lead) to be fired from a firearm."  (Merriam-Webster Unabridged Dict. Online (2018) <https://www.merriam-webster.com/dictionary/bullet> [as of Feb. 7,

2025], archived at <https://perma.cc/S3PU-PFLS>, at noun (1).) On the other hand, a cartridge consists of a bullet, a casing, and primer. (*People v. Grayson* (2000) 83 Cal.App.4th 479, 487; see also RT 1232-1233.) By responding that nine total bullets were discovered in the gun (again eight in the magazine and one jammed in the chamber), the clear impression is that nine cartridges of unfired ammunition were discovered because a mere casing is not a bullet. If the "bullet" found in the chamber had already been fired, then Ramirez would have testified that eight "bullets" were in the magazine and one "casing" was jammed in the chamber. Moreover, Detective Ortiz confirmed that nine "live cartridges" were sent for testing, one from the pistol itself and eight from the magazine. Additionally, Hamiel testified that there was a malfunction with the gun jamming in that it would not cycle cartridges. That is, the ejection mechanism would not work because it would not eject the casing (or cartridge if the cartridge had not been fired) and then automatically load the next cartridge. Based on Hamiel's description, if an unfired cartridge was in the chamber, the only way to remove the unfired cartridge would be to manually remove it because the ejection mechanism would not eject the cartridge.

The prosecutor's comment is consistent with the testimony of Ramirez, Ortiz, and Hamiel. Ramirez's testimony suggested that there was an unfired cartridge in the chamber of the pistol, and Ortiz expressly testified that there was an unfired cartridge in the chamber. Because Gonzalez had been killed by a gunshot, Hamiel's testimony supports the deduction that someone manually loaded the unfired cartridge after a previous cartridge had been fired. Therefore, we conclude that there is no misconduct because the prosecutor's statements were fair comments on, and reasonable deductions from, the evidence. (*Dworak*, *supra*, 11 Cal.5th at p. 910; *Lewis*, *supra*, 50 Cal.3d at p. 283.) Because there was no misconduct, defense counsel could not be deficient for failing to object. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463 (*Ochoa*) ["Representation does not become deficient for failing to make meritless objections[.]"]; *People v. Sanchez*

(2019) 38 Cal.App.5th 907, 915 (*Sanchez*).)  Without a deficient performance, there can be no ineffective assistance of counsel.  (*Strickland*, *supra*, 466 U.S. at p. 697; *Camino*, *supra*, 188 Cal.App.4th at p. 1377.)

### b. Peeling Skin Comments

The prosecutor three times mentioned that parts of Gonzalez's skin had peeled off due to sun exposure.  As quoted above, the Second Comment was made in the context of describing the coroner's testimony about how an autopsy was conducted, what Dr. Super observed, and what photographs depicted.  We detect no misconduct from simply repeating admitted testimony.  (See *Dworak*, *supra*, 11 Cal.5th at p. 910.)  Therefore, defense counsel was not deficient for failing to object to the second comment concerning peeling skin.  (*Ochoa*, *supra*, 19 Cal.4th at p. 463; *Sanchez*, *supra*, 38 Cal.App.5th at p. 915.)

As for the First and Third Comments, the record suggests misconduct by misstating the evidence (cf. *Hill*, *supra*, 17 Cal.4th at p. 823; *Bittaker*, *supra*, 48 Cal.3d at p. 1105), and utilizing " ' " ' "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response[.]" ' " ' " (*People v. Singh* (2024) 103 Cal.App.5th 76, 122; see *People v. Vance* (2010) 188 Cal.App.4th 1182, 1192–1193.)  Specifically, the First Comment stated that Sanchez left Gonzalez's body out in the sun for so long the Gonzalez's skin began to rub off from sun exposure.  However, the evidence indicates that Gonzalez's body was in the sun for less than one hour before it was discovered, and that the length of the investigation, as opposed to Sanchez's actions, was the reason for prolonged sun exposure.  Similarly, the Third Comment described the physical evidence at the scene and Gonzalez's wounds.  After mentioning "the peeling of his skin," the prosecutor stated that Sanchez wanted the jury to believe that Gonzalez was bound to be found because someone could come to the property.  However, Gonzalez's peeling skin is an unexpected and frightful condition that has nothing to do with the gunshot wound that

49.

Sanchez inflicted, or the veracity of any claim relating to self-defense, or any element of murder.

Assuming that defense counsel was deficient for failing to object to the prosecutor's First and Third Comments, we cannot conclude that Sanchez was prejudiced by the deficiency. The two comments are not unduly gruesome as they involve only the terms "peeling skin" or skin that had "rubbed off" without any elaboration, detail, or flourish. Further, the comments were not extensive. The First Comment, or "rubbed off" comment, was part of a single sentence in the closing statement, and the Third Comment, or the "peeling skin" comment, was part of a single sentence in the rebuttal. It is apparent that the two comments were not a focal point or a critical part of the prosecutor's arguments or theories. Moreover, the jury had been informed that Sanchez left work around 9:00 a.m. and returned home between 9:00 a.m. and 10:00 a.m., and that Gonzalez's body was found by his friend around 10:00 a.m. Therefore, the jury knew that Gonzalez's body was found shortly after he had been killed, and the timeframe involved is not one that would typically be expected to cause skin to peel or rub off due to sun exposure. Further, the jury was also informed of the investigation that ensued, including Dr. Super's on-site visit. The jury would have been well aware that Gonzalez's body was kept out in the sun because of the investigatory efforts, and not because of any affirmative actions by Sanchez. It is obvious that Sanchez could not determine how long the investigators would decide to leave Gonzalez's body exposed to the sun. Finally, the statements do nothing to undermine the evidence presented that Gonzalez had been sitting down when he was shot, or the inculpatory statements that Gonzalez himself made to Ramirez and Ortiz. For these reasons, we conclude that Sanchez has failed to establish either " 'a reasonable likelihood the jury construed the remarks in an objectionable fashion' " (*Fayed*, *supra*, 9 Cal.5th at p. 204), or a reasonable probability that the result of the proceeding would have been more favorable to him in the absence of the First and

50.

Third Comments.  (*Cullen*, *supra*, 563 U.S. at p. 189; *Woodruff*, *supra*, 5 Cal.5th at p. 762.)

Accordingly, because Sanchez did not suffer prejudice, his Sixth Amendment right to the effective assistance of counsel was not violated.  (*Buck*, *supra*, 580 U.S. at 118; *Cullen*, 563 U.S. at p. 189; *Johnsen*, *supra*, 10 Cal.5th at p. 1165.)

## IV.    Cumulative Error

Sanchez argues that the cumulative effect of the multiple errors and harm rendered his trial fundamentally unfair.  However, we have found only one possible error with respect to the prosecutor's closing argument and determined that the error was harmless.  When there is but a single error, there can be no "cumulative error."  (*People v. Wall* (2017) 3 Cal.5th 1048, 1072.)

## V.    Misunderstanding of Discretion under *People v. McDavid*

### A.    Parties' Arguments

The parties agree that the trial court was unaware of the scope of its sentencing discretion with respect to the firearm enhancement because *People v. McDavid* had yet to be decided.  Since the record does not indicate what the court would have done had it been aware of *McDavid*, the parties also agree that the sentence should be vacated.

### B.    Legal Standard

"Defendants are entitled to sentencing decisions made through the exercise of informed discretion."  (*McDavid*, *supra*, 15 Cal.5th at p. 1023; see *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  A court that acts "while unaware of the full scope of its discretion is deemed to have abused it."  (*McDavid*, at p. 1023.)  When a lower court is unaware of the scope of its discretion when it imposes a sentence, the "appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' "  (*Gutierrez*, at p. 1391.)

51.

## C.     Analysis

At the time Sanchez was sentenced, there was a split among the Courts of Appeal over whether trial courts had the ability and discretion to impose an uncharged lesser included firearm offense outside of Penal Code section 12022.53 after the trial court strikes, pursuant to Penal Code section 12022.53, subdivision (h), a charged and proved Penal Code section 12022.53 firearm enhancement.  After Sanchez was sentenced, our Supreme Court decided *People v. McDavid*, which resolved that split.  *McDavid* held: "[W]hen a court has exercised its discretion under [Penal Code section 12022.53,] subdivision (h), to strike a section 12022.53 enhancement and finds that no other section 12022.53 enhancement is appropriate, the second sentence of subdivision (j) is inapplicable and does not bar the court from imposing a lesser included, uncharged enhancement under a law other than section 12022.53." (*McDavid*, *supra*, 15 Cal.5th at p. 1030.)  In this case, the trial court clearly did not have the benefit of *McDavid*.  After reviewing the record, we agree with the parties that there is no indication as to how the court would have sentenced Sanchez had it been aware of its discretion as clarified by *McDavid*.  Therefore, we will vacate Sanchez's sentence and remand the matter for a new sentencing.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## **DISPOSITION**

Sanchez's sentence is vacated, and this matter is remanded for a full resentencing consistent with this opinion.  The judgment is otherwise affirmed.


FAIN, J.*

WE CONCUR:


HILL, P. J.


MEEHAN, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.